## SAMUEL M. LOEWENSTEIN, Appellant, v. QUEEN INSURANCE COMPANY et al.

**In Banc, March 30, 1910.**

1. **INSURANCE: Proof of Loss.** The law gives the insurer the right to demand proofs of loss, involving the sifting of the conscience of the insured, but it does not restrict the insurer in his investigations to the proofs of loss furnished by the insured.
   *Held*, by LAMM, J., in a dissenting opinion, that while proofs furnished by the insured mortgagor, under the policy scheme providing that the interest of the mortgagee or trustee "shall not be invalidated by any act or neglect of the mortgagor or owner," would be all the proofs necessary to entitle the mortgagee to recover by suit in those jurisdictions requiring proofs of loss as a condition precedent to a recovery on the policy by the mortgagee, yet proofs by the mortgagee himself, under his oath and on his personal knowledge, cannot take the place of that sifting and purging of the conscience to which the company is entitled from the owner of the property.

2. ———: ———: **Waiver.** The law gives the insurer the right to waive proofs of loss. When he has otherwise all the information that he requires and is satisfied the insured is entitled to be paid, he may waive the proof of loss.

3. ———: ———: ———: **Inducement.** If the insurer knowingly induces the insured to believe that he will waive the formal proof of loss, and the insured, acting on that belief, fails to make proof, the insurer cannot escape liability on the ground that no formal proof of loss was made.

4. ——— : ——— : **Of One of Several Policies: Waiver.** Where there were three separate policies issued by the three separate companies on the one house destroyed by fire, proof of loss given to one is not proof of loss to the others, if they acted singly; but where the adjuster was the agent of the three companies to adjust the losses on the three policies, they were not acting singly, and proof of loss to one afforded their joint agent all the information they would have acquired had a separate technical proof been made to each, for the separate proofs would have been duplicates in all respects, except as to the names of the companies. And where the joint adjuster received and accepted a minute proof of the loss of the personal property, and assured the owner of the property that the house was a total loss and the insurance on it would be paid, he waived proof of loss on the house for the three companies.

*Held,* by LAMM, J., dissenting, that the evidence of proof of loss being oral and conflicting, deference should be accorded to the chancellor, who found as a fact that there had been no waiver.

5. ——— : **Payment to Mortgagee: Subrogation: Assignment.** If one secondarily liable pays a debt, he is entitled, as against the debtor who is primarily liable (there being no other fact in the case *contra*), to be subrogated to all the rights of the creditor, including securities held by him, and this, although there is no express agreement for subrogation, for the right arises by operation of law, and an agreement expressly declaring that in that event a right of subrogation shall arise neither adds to nor takes from the right. Subrogation is a right which the law of its own force creates, and it is allowed only when equity, under the facts, and with or without a contract, gives it. But assignment stands on contract, and before the insurance company, which has paid the money called for by its policy to the mortgagee, can claim the notes and mortgage, it must establish its right to them by a valid legal assignment. If the money it paid him was simply in payment of a debt it owed him under its contract of insurance, the only thing it acquired was a discharge of its obligation thereunder, and not the title to the mortgage notes and deed of trust, and it cannot have foreclosure.

*Held,* by LAMM, J., dissenting, that subrogation may be specifically contracted for, and a provision in the policy that the "loss or damage shall be payable to the mortgagee, as his interest may appear," and "whenever this company shall pay the mortgagee any sum for loss under this policy and shall claim that, as to the mortgagor or owner, no liability therefor existed, this company shall, to the extent of such payment, be thereupon legally subrogated to all the rights

of the party to whom such payment shall be made, under all securities held as collateral to the mortgage debt, or may at its option, pay to the mortgagee the whole principal sum due, and shall thereupon receive a full assignment and transfer of the mortgage and of all such other securities," should be enforced as a contract; and the company having paid the mortgagee the loss, and received an assignment of the notes and deed of trust from him, the mortgagor should not be permitted to have the mortgage cancelled as an unlawful cloud upon his title.

6. ————: ————: ————: This Contract. The contract provided that if the insurance company pay the mortgagee "and shall claim that, as to the mortgagor or owner, no liability therefor existed," then the company shall be subrogated to all the rights of the mortgagee and the latter shall assign the notes and deed of trust to the company. The company paid the insurance to the trustee in the deed of trust, and now claims it thereby acquired title to the notes and asks foreclosure. Held, proceeding on the theory that the mortgagor failed to make proof of loss, and that the company did not waive such proof, first, that the company acquired no title to the notes, but simply discharged its obligation to pay the loss; and, second, to hold the quoted words to mean that the company is not liable if it claims it is not liable, would be unreasonable.

Held, by LAMM, J., dissenting, that the policy contemplated that a condition might arise in which it would insure the mortgagee, and not the mortgagor, and that condition arose when the mortgagor failed to make proof of loss; and the policy providing that upon payment to the mortgagee an assignment of the notes and deed of trust should be made to the company and it should be subrogated to all such securities, and that assignment having been made, they should not be canceled.

7. ————: ————: Proof of Loss: Limitation of Action. Failure to make proof of loss within the time specified is simply a limitation upon the right of action; it does not extinguish the mortgagor's right, after the company has paid the insurance to the mortgagee, to maintain suit to cancel the mortgage as an unlawful cloud upon his title.

8. ————: ————: Rights of Mortgagor. When the insurance company without suit pays the mortgage debt and takes from the mortgagee an assignment of the notes and deed of trust, the mortgagor may maintain a suit in equity against the company, not on the policy and not in its capacity of underwriter, but in its capacity as assignee and holder of the security under its

assignment from the mortgagee, and compel it to cancel the securities and clear the record of an unlawful cloud.

9. **APPELLATE JURISDICTION: Title to Real Estate: Suit to Cancel Deed of Trust.** A petition charging that the defendant had by an unlawful assignment obtained possession of a deed of trust, and holds it claiming it to be a valid incumbrance on plaintiff's land, and praying that it be surrendered and cancelled as a cloud upon the title, involves title to real estate and the appeal is to the Supreme Court. The only issue in such case is not whether the debt has been paid, nor is it a controversy between a debtor and creditor, but the real issue is whether the assignee, who in no sense was a party to the mortgage, has by the assignment obtained a legal right to becloud the title, and the Court of Appeals could not remove that cloud.

Appeal from St. Louis County Circuit Court.—*Hon. John W. McElhinney,* Judge.

REVERSED AND REMANDED (*with directions*).

*Lee Sale* for appellant.

(1)   Where the owner of mortgaged property at his own expense insures his property for the joint benefit of himself and the holder of the mortgage, and the property is destroyed while the policy is in force and effect as to the interest of both mortgagor and mortgagee, and the insurance is paid to the mortgagee, equity will not subrogate the insurance company to the rights of the holder of the mortgage. Sheldon on Subrogation, sec. 236, p. 353; 19 Cyc. 893; 2 May on Ins., sec. 450, p. 1070; Ins. Co. v. Race, 142 Ill. 338; Kernochan v. Ins. Co. 17 N. Y. 428; Pearman v. Gould, 42 N. J. Eq. 4; Graves v. Ins. Co., 10 Allen 281; Wolcott v. Sprague, 55 Fed. 545; Havens v. Ins. Co., 135 Mo. 649. (2)   Any money paid to the mortgagee under the provisions of the policy must be applied in payment of these notes. 27 Am. and Eng. Ency. Law, 264; Dick v. Ins. Co., 10 Mo. App. 376, 81 Mo. 103; Home Ins. Co. v. Marshall, 48 Tex. 235. (3)   Inasmuch as the answer shows that the property insured (real estate) was wholly

destroyed by fire while the policies were in full force and effect, and there is no stipulation in either policy that a forfeiture should result from a failure to furnish proofs, the inquiry as to whether proofs of loss were furnished was immaterial. Dezell v. Fidelity & Casualty Co., 176 Mo. 253; Ostrander on Fire Insurance, sec. 233; Germania Ins. Co. v. Ashby, 112 Ky. 303; Continental Casualty Co. v. Waters, 97 S. W. (Ky.) 1103; Thaxton v. Ins. Co., 143 N. C. 33; Wolcott v. Sprague, 55 Fed. 545; Kahnweiler v. Ins. Co., 57 Fed. 562. (4) The conduct of the adjuster (who represented not only the companies holding policies on the real estate, but also the company holding a policy on the household effects) towards the insured and his attorney, in refusing to accept proofs of loss on the household effects from February 13th (the date they were furnished) until May 16th, during which period he was claiming a breach of the provision of the policies in respect to the use of gasoline, constituted a waiver of proofs of loss in respect to the real estate. Gale v. Ins. Co., 33 Mo. App. 664; Summers v. Ins. Co., 45 Mo. App. 46; Landrum v. Ins. Co., 68 Mo. App. 339; Dezell v. Fidelity & Casualty Co., supra. (5) If, as is held in many cases, there was a duty resting upon the mortgagee, Farrar, or a right in him, to make proofs of loss, where the mortgagor failed to do so, payment to the mortgagee without proofs was a waiver of proofs of loss. Lombard Investment Co. v. Ins. Co., 62 Mo. App. 315; Union Institution v. Ins. Co., 81 N. E. (Mass.) 994; Nickerson v. Nickerson,, 80 Me. 100; Southern Loan Assn. v. Ins. Co., 94 Ga. 167; Wolcott v. Sprague, 55 Fed. 545. The testimony of Farrar, showing that the adjuster took out of his hands the matter of furnishing proofs, coupled with the adjuster's own testimony that he told Farrar that there was no way in which he (Farrar) could be beaten out of his interest in the policies, shows a waiver of proofs. See cases cited under foregoing points. (6) The hold-

er of the second mortgage, as a cerditor of the assured having a lien on the property, had a right himself to make proofs of loss in a proper proceeding, if the assured failed or refused to do so. Ins. Co. v. Atkins, 3 Bush (Ky.) 328; Reid v. Mercurio, 91 Mo. App. 673. Hence, the conduct of the adjuster (as shown by his own testimony) in allowing plaintiff to be misled as to the company's intentions in reference to the loss, although he knew that plaintiff represented the holder of the second mortgage, should estop defendants from claiming as against plaintiff (who acquired title under that deed of trust) that proofs of loss were not furnished. Maddox v. Ins. Co., 39 Mo. App. 198; McCullom v. Ins. Co., 67 Mo. App. 66. (7) The conduct of the adjuster (as shown by plaintiff's testimony) inducing plaintiff, who called to see him frequently between the date of the fire and the date when proofs of loss were required to be furnished, to believe that the loss on the real estate would be paid, should estop defendants from claiming against plaintiff that proofs of loss were not furnished. (8) Plaintiff having acquired title at public sale on June 14, 1902, and the claim of subrogation having been concealed from plaintiff by the adjuster and only asserted on or about July 1, 1902, equity will not decree subrogation as against plaintiff. Sheldon on Subrogation, sec. 44, p. 68.

*Barclay & Fauntleroy* and *P. H. Cullen* for respondents.

(1) Where the owner of mortgaged property procures insurance pursuant to a provision requiring the mortgagor to insure and the insurance policies are payable to the mortgagee as his interest may appear, under such a "mortgagee clause" as is here involved, wherein it is provided that no default of the mortgagor can defeat the insurance, as to the mortgagee only, and if the mortgagor (the insured) fails to comply with

the policy, upon payment to the mortgagee of the mortgage debt, the insurer is entitled to be subrogated to the mortgagee's right, as the policy provides. Ins. Co. v. Allen, 43 N. Y. 389; Foster v. Van Reed, 70 N. Y. 19; Savings Co. v. Leake, 73 N. Y. 161; Badger v. Platt, 44 Atl. 296; Ins. Co. v. Davis, 23 Tex. Civ. App. 342. The parties are competent to contract for subrogation (as is done here), where policy is not complied with by mortgagor, and the courts will enforce the contract. Gillespie v. Ins. Co., 61 W. Va. 169; Allen v. Ins. Co., 132 Mass. 480, distinguishing Graves v. Ins. Co., 10 Allen 281. The "stipulations" and provisions of the policy for subrogation, are a "part of the consideration" supporting the contract and will be enforced. Sav. Inst. v. Leake, 73 N. Y. 166; Shapiro v. Ins. Co., 53 N. W. 463; Day v. Ins. Co., 23 Barb. 623; Ostrander on Ins., pp. 255, 256. (2) None of the cases cited by appellant under (1), is in point here—none of them had, or involved, the "mortgagee clause," such as is involved in this action. All of appellant's cases are simply cases where the loss was payable to some mortgagee, without any provision for subrogation, such as we have. (3) Section 7969, R. S. 1899, in regard to valued policies, was enacted prior to 1889 and was carried into the revision of 1889 as section 5897. Construing this section, in connection with the policy requirements as to proofs of loss, the courts of this State have, without exception, held that the furnishing of proofs of loss to the insurer is a condition precedent, and a failure to comply therewith prevents recovery. McCullough v. Ins. Co., 113 Mo. 13; Burnham v. Ins. Co., 75 Mo. App. 400; Sullivan v. Ins. Co., 89 Mo. App. 112; Leigh v. Ins. Co., 37 Mo. App. 542; Bank v. Ins. Co., 109 Mo. App. 658; Roberts v. Ins. Co., 94 Mo. App. 142; Loesch v. Ins. Co., 176 Mo. 664; Sims v. Ins. Co., 47 Mo. App. 54; Hazzard v. Co., 53 Mo. App. 98; Hanna v. Co., 36 Mo. App. 538. (4) Under our statutes, which make it necessary for the insurance company to

furnish blank proofs of loss, when the blank proofs are furnished to the insured, they become conditions precedent, and if not returned properly filled out, within the sixty days, the policy becomes void. Warren v. Ins. Co., 72 Mo. App. 190; Sappington v. Insurance Co., 77 Mo. App. 270. Failure to render these proofs precludes recovery on the policy, notwithstanding the valued policy statutes. McCollum v. Ins. Co., 67 Mo. App. 78; Reid v. Mercurio, 91 Mo. App. 687. (5) Under the provisions of the policies involved in this suit, preventing any act of the mortgagor from in any way invalidating the insurance as to Farrar, the trustee, only, the payment to Farrar constituted no waiver of the proofs. Burnham v. Ins. Co., 75 Mo. App. 399; Adams v. Ins. Co., 115 Mo. App. 21. (6) Where the assured fails to make proofs and the mortgagee submits proofs the assurer may reject these, the duty of furnishing the same being on the mortgagor, who is the insured. Armstrong v. Ins. Co., 130 N. Y. 560; Sims v. Ins. Co., 47 Mo. 60; Hicks v. Ins. Co., 6 Mo. App. 259; Ins. Co. v. Shrader, 33 S. W. 585. (7) Where the facts are undisputed about furnishing proofs of loss, the question of waiver becomes one of law, not of fact. Hanna v. Ins. Co., 36 Mo. App. 539; Pretzfelder v. Ins Co., 28 Ins. Law Jour., 169; Parmalee v. Ins. Co., 54 N. Y. 196; Brim v. Ins. Co., 111 Ind. 281; Waters v. Ins. Co., 30 S. W. 577. (8) The claim made in points 4, 5, 6, and 7 of appellant's brief, must fail, for the reason that there are no facts set up in the petition or reply, which make any claim, or show any reason why the principle of estoppel should be asserted by plaintiff, or which should preclude the defendant from insisting upon the forfeiture of the policy, for the reason no proofs of loss were made. The facts which go to create an estoppel in pais must be set forth "with certainty." Bank v. Doran, 109 Mo. 40 (and this is true in equity); Noble v. Blount, 77 Mo. 235; Hammerslough v. Cheatham, 84 Mo. 13; Bray v. Mar--

shall, 75 Mo. 327; Golden v. Hardesty, 61 N. W. 914. We understand that, in the usual and ordinary "insurance cases," under an allegation of performance you can show facts establishing a waiver of the performance of the terms and conditions of a policy of insurance, but this is confined exclusively to insurance cases where the suit is on the policies, for the recovery of the money. Even then there must be the usual allegations that all conditions precedent were "duly performed," so as to bring it within the provisions of the statute in regard to the pleading and performance of the conditions precedent. R. S. 1899, sec. 634; Duff v. Ins. Co., 129 Mo. 460; Furlong v. Ins. Co., 18 N. Y. Supp. 844. The conditions themselves must be set up. (9) The notes and mortgage having been assigned to the insurance companies, the same are a valid lien upon the property, irrespective of this "mortgagee clause." Allen v. Ins. Co., 43 N. Y. 389; Ordway v. Chace, 42 Atl. 149; Badger v. Platt, 44 Atl. 296.

VALLIANT, C. J.—This is a suit in equity wherein the plaintiff seeks to cancel a mortgage or deed of trust held by the defendants, the insurance companies, on the ground that the debt secured thereby has been paid. The defendants by their answer and crossbill deny that the debt has been paid and assert that they purchased the same, that they are the owners thereof and they pray a foreclosure. The trial resulted in a decree dismissing the plaintiff's bill and foreclosing the mortgage as prayed in defendants' crossbill. From that judgment the plaintiff has brought this appeal.

The following facts of the case are undisputed:

The title to the property is traced back to one Hopple, who in 1901 executed a deed conveying the land to one B. G. Farrar, trustee, to secure a principal promissory note for $2800, due three years after date, and twelve interest notes. That is the deed of trust in dis-

pute in this case. After executing that deed of trust Hopple on the same day sold the property to one Choisel, and Choisel afterwards sold it to Williams and wife; both the last named conveyances were made expressly subject to that deed of trust and the grantee in each conveyance assumed to pay these notes. The deed of trust required the owner of the property to insure the buildings to the amount of the mortgage debt and assign the policies to the trustee. Accordingly Choisel while he owned it took out two policies of insurance on the building for $1550 each, one in the defendant the Queen Insurance Company of America, the other in the defendant the Phoenix Assurance Company, London, that is, $1500 each on the dwelling-house and fifty dollars each on the outhouses, $3100 in all.

When Choisel sold the property to the Williamses he assigned the policies to them with the written consent of the insurance companies. These policies were delivered to Farrar the trustee and were held by him when the fire hereinafter mentioned occurred. In each of the policies was the following clause:

"Loss or damage, if any, under this policy, shall be payable to Bernard G. Farrar as mortgagee (or trustee), as interest may appear, and this insurance, as to the interest of the mortgagee (or trustee) only therein, shall not be invalidated by any act or neglect of the mortgager or owner of the within described property, nor by any foreclosure or other proceedings or notice of the sale relating to the property, nor by any change in the title or ownership of the property, or by the occupation of the premises for purposes more hazardous than are permitted by this policy. Provided, that in case the mortgagor or owner shall neglect to pay any premium due under this policy, the mortgagee (or trustee) shall, on demand pay the same. . . .

"Whenever this company shall pay the mortgagee (or trustee) any sum for loss or damage under this policy and shall claim that, as to the mortgagor or own-

er, no liability therefor existed, this company shall, to the extent of such payment, be thereupon legally subrogated to all the rights of the party to whom such payment shall be made, under all securities held as collateral to the mortgage debt, or may at its option, pay to the mortgagee (or trustee) the whole principal due, or to grow due on the mortgage with interest, and shall thereupon receive a full assignment and transfer of the mortgage and of all such other securities; but no subrogation shall impair the right of the mortgagee (or trustee) to recover the full amount of its claim.''

There is also a long clause in each policy providing that: "This entire policy shall be void if'' certain acts are done, or certain other acts are omitted to be done, e. g., concealment or misrepresentation of conditions; taking out other insurance on same property without consent of this insurer; keeping gasoline except under certain conditions, etc. etc.; but not including under that head the failure to make proof of loss after fire.

The Williamses took out a third policy of insurance in another company to cover their household goods, etc., in the dwelling house. At the time of their purchase from Choisel they executed a second deed of trust to secure him the purchase money which they had agreed to pay, twenty-nine hundred dollars; this second deed of trust was foreclosed June 14, 1902, and at the foreclosure sale the plaintiff became the purchaser; thus the plaintiff became the owner of the property subject to the first deed of trust. In January, 1902, before the foreclosure sale, the dwelling house was destroyed by fire. At that time, the property belonged to the Williamses, subject to the two deeds of trust. When the fire occurred the three insurance companies were duly notified and they appointed an adjuster to represent them; the same person was the adjuster for the three companies. The policies contained a clause requiring proof of loss, to-wit, that the assured "within

sixty days after the fire, unless such time is extended in writing by this company, shall render a statement to this company, signed and sworn to by the assured, stating the knowledge and belief of the assured as to the time and origin of the fire; the interest of the insured and of all others in the property," etc., etc., following the form used in all such policies. Following that and other clauses was this: "No suit or action on this policy, for the recovery of any claim shall be sustainable in any court of law or equity until after full compliance by the insured with all the foregoing requirements." The adjuster furnished the Williamses blanks on which to make proofs of loss. In due time they made proof of loss under their policy on their household goods and that loss was adjusted, but they did not make proof of loss on the policies covering the dwelling house. On July 1, 1902, the defendant insurance companies paid to Farrar the trustee the sum of $2902.30 which was the full amount of principal and interest then due on the deed of trust in question, and took from him an assignment of the notes and deed of trust and now hold the same claiming that it is a subsisting mortgage on the property in their favor and that they are entitled to foreclose it for their benefit; that claim is disputed by the plaintiff and it is the vital issue in the case.

The facts above stated are undisputed, but there is a conflict of testimony on the question whether or not the adjuster waived the proofs of loss. The plaintiff testified that he went with Mr. Williams to see the adjuster about the payment of the policies and the adjuster said that so far as the house was concerned it was a total loss and the insurance on the house would be settled, but they had not determined what to do about the insurance on the personal property, they wanted to settle everything at the same time. The personal property policy called for two thousand dollars and in the proof of loss the Williamses claimed it was

worth very much more than that, but the matter was finally adjusted by the companies paying Williams one thousand and six hundred dollars on that policy. The adjuster testified that the plaintiff had come to him several times about the matter; he said: ''I could not undertake to repeat the words. He (the plaintiff) came up to see me about this fire, and about the second mortgage interest that he had, and I can remember my feeling about it—my idea about it—which was that I didn't consider he had any interest in it. . . . Q. Did you hear Mr. Loewenstein testify that you gave him to understand that the policies on the building would be settled? A. I heard him so testify. . . . Q. What if anything did you state on that subject? A. I didn't state anything about settling these policies with Loewenstein. Q. Did that subject ever come up between you and Loewenstein at all? A. Not that I can recollect.''

Mr. Williams employed an attorney to assist him in the negotiations and that attorney testified that after several meetings with the adjuster and discussions of the matter, they concluded that there was no profit to Williams in going to the expense of making proof of loss and collecting the insurance on the dwelling house and that unless Loewenstein would allow him something he would abandon it; they went to Loewenstein but he declined to make any concession and Williams dropped the matter. We infer from the evidence that while those negotiations were going on Loewenstein was the holder of the second deed of trust, which had not then been foreclosed.

The circuit court in an elaborate decree, including its finding of facts, finds especially that the Williamses failed to make proofs of loss and therefore ''each of said policies became null and void as to the said insured Zachery T. and Priscilla Williams.'' Then follows the finding that the mortgage notes were duly transferred and assigned by Farrar to the insur-

ance companies and adjudges that they thereby became subrogated to the rights of the mortgagee and were entitled to foreclose the deed of trust and it was so decreed.

I. The only ground on which the court based its adjudication that the policies became null and void was the failure of the Williamses to make proofs of loss and that is really the only ground on which respondents now seek to uphold that adjudication. In their briefs learned counsel for respondents point out the importance and justice of the requirement of proof of loss in fire insurance, the searching of the conscience of the insured and the sifting of the evidence by the adjuster to see that there has been no fraud perpetrated. We agree to all that is said on that subject; but we know that the law does not restrict the insurer in his investigations to the proofs of loss furnished by the insured. The insurer may institute his independent investigation and the adjudicated cases on contested policies show that he frequently does so. Whilst the law gives the insurer the right to demand proofs of loss, involving the conscience of the insured, it also gives him the right to waive that right and the adjudicated cases show that he is sometimes adjudged to have done so even when he insists that he did not. The proof of loss is no mere form; it has a wise purpose; it is for the information and satisfaction of the insurer; but when he has otherwise all the information that he requires and is satisfied that the insured is entitled to be paid, he may waive the proof of loss. There is no dispute of that proposition. And it is equally as clear that if he knowingly induces the insured to believe that he will waive the formal proof of loss, and the insured, acting on that belief, fails to make the proof, the insurer cannot escape liability on that ground. The adjuster in this instance was the agent of the three in-

227 Sup—8

surance companies to adjust the losses on these three policies. There is no evidence of an express waiver; on the contrary the evidence is that in the beginning he furnished blanks to make the proofs, but after the negotiations were under way and after the adjuster had apparently satisfied himself as to the facts he, according to the plaintiff's testimony, said that as to the insurance on the house there was no doubt but that it was a total loss and that it would be paid, but the point to be adjusted was in relation to the insurance on the personal property, and even as to that, so far as the evidence shows, the only question was as to the quantum of damages and the result was that the policy which called for two thousand dollars was compromised for one thousand and six hundred dollars. In that case formal proof of loss was furnished, and whilst it did not technically relate to the insurance on the house, yet it contained substantially all the facts that the proofs of loss on the house would have contained. It was the same, for example, as if proof of loss on one of the policies insuring the house had been furnished to the adjuster and not on the other, yet if the other had been furnished it would have been only a duplicate, except as to the name of the company, of the one furnished. [Richards, Ins. L. (3 Ed.), p. 411.] If these companies had been acting singly, proof given to one would not be proof given to the other, but they were not acting singly, they were all acting through the same agent. Besides the formal proof of loss, the evidence shows that when Mr. Williams visited the adjuster, the latter questioned him and took down his answers in writing. We are not now saying, and it is not necessary to say, that each of these companies was not technically entitled to a proof of loss under its own policy, but we do say that for actual information the proof under one policy afforded their joint agent all that they needed and all that they would have acquired if a proof had been made in each case, and

so far as actual loss of information to them is concern-ed, they have suffered none. But the importance of that testimony is its bearing on the question of waiver. The adjuster had the right to waive the proof and the fact that he had the proof in one case, binding the conscience of the assured and holding over him the penalty of false swearing, if it was false, giving him full information in reference to the same fire, furnishes a very reasonable motive in the adjuster to waive other proofs which could add nothing to the information he already had. It is more likely that an intelligent and experienced adjuster would waive proofs under such circumstances than if he were not otherwise sufficiently informed. The adjuster did not deny that he made the statement that the plaintiff testified he made, but when confronted with the plaintiff's testimony on that point and asked what he did say on that subject he answered: "I didn't state anything about settling these policies with Loewenstein." He had previously testified that he did not consider Loewenstein as having any interest in the matter. It may be literally true that he said nothing about settling the policies with Loewenstein, yet it may also be true that he said to Williams in Loewenstein's presence that the house was a total loss and those policies would be paid. The fact that Williams declined to furnish the proofs because there was nothing coming to him from that source only goes to show what Williams' motive was, it does not tend to contradict the plaintiff's testimony. Williams seemed to think he had no interest in making the proof, as the margin, after paying the Farrar mortgage, would go towards payment of the mortgage held by Loewenstein, and when he went to Loewenstein to ask for a rebate the latter refused. If Loewenstein had thought that the proofs were essential he would naturally have been more anxious to have obtained them, but if he was sat-isfied from what the adjuster had said that there would be no question raised as to the payment of those poli-

cies, he would have been less inclined to give money to obtain the proofs.

As we weigh the testimony we are of the opinion that the adjuster waived the proofs of loss and if the case is to turn on that point, as it seems to have turned in the trial court, we hold that failure to furnish the proofs under the circumstances does not affect the defendants' liability under the policies.

II.  But even if there had been no waiver of the proofs of loss, the defendants acquired no title to the notes and deed of trust obtained from Farrar; the money they paid him was simply in payment of a debt they owed and the only thing they acquired was a discharge of their obligation.

A mortgagee has an insurable interest in the mortgaged property, therefore he may, on his own account and at his own expense, take out a policy of insurance to secure that interest, but that is quite different from this case.  If a mortgagee takes out such a policy the contract of insurance may provide for an assignment of the mortgage debt with its security in the event of loss by fire and payment of the insurance.  In such case the contract of insurance is a sufficient consideration to support the contract for assignment.  Indeed under such circumstances if there was no express agreement for assignment doubtless equity would subrogate the insurer after he had paid the debt, to the rights of the mortgagee.  The right of subrogation is an equity that arises out of a condition and does not depend on contract.  Like a vendor's lien or a resulting trust it arises when justice demands it and the course of equity jurisprudence allows it.  In Words and Phrases, vol. 7, p. 6723, it is said: "A distinction must be observed between subrogation to and an assignment of a mortgage."  In Pomeroy, Equity, note to section 1419, it is said:  "The doctrine of subrogation is of wide extent and operation in various depart-

ments of equity jurisprudence. . . . Being a doctrine of purely equitable origin and nature, its operation is always controlled by equitable principles.''

If one secondarily liable pays a debt, he is entitled as against the debtor who is primarily liable (there being no other fact in the case contra) to be subrogated to all the rights of the creditor, including securities held by him, and this, although there is no express agreement for subrogation; the right arises by operation of law and in such case an agreement expressly declaring that in that event a right of subrogation shall arise, neither adds to nor takes from the right, which the law of its own force creates.

Whilst the terms ''subrogation'' and ''assignment'' are both used in the mortgage clauses of these two policies, yet so far as the term ''subrogation'' is concerned its effect is nothing, unless under the facts of the case equity would give a subrogation without the contract, but assignment is different, it stands on contract. The insurance companies in this case, as shown by their briefs, are both relying solely on the contract contained in the mortgagee clause of the policies; we do not understand that, independent of the contract, they claim to be the equitable owners of this mortgage debt and deed of trust, and if they should make such a claim we see nothing in the facts of the case to support it. Let us consider the contract. We have already mentioned that class of contracts where the mortgagee on his own account and at his own expense takes insurance on the mortgaged property for his own protection. There is nothing of that kind in this case and cases in the books discussing the relative rights of parties to such a contract are of no assistance to us in this inquiry. But here we have a contract wherein it is provided that if the insurer pay the mortgagee ''and shall claim that, as to the mortgagor or owner, no liability therefor existed'' then the insurer shall be subrogated to all the rights of the mortgagee

and the latter shall assign the notes and deed of trust
to the insurance company. The language there em-
ployed is peculiar; literally it means that when the com-
pany pays the debt if it should claim that it is not lia-
ble to the mortgagor, then it is not liable. It has been
said in support of such a clause that it does not mean,
that a mere claim by the insurance company that it is
not liable will be sufficient to support the claim for
subrogation, but that it must be a reasonable claim.
But even that qualification would not give validity to
such a claim, because a claim might have some plausi-
ble or reasonable appearance yet fall short of legal
justification. In Richards' Ins. Law (3 Ed.), page 400,
it is said: "Despite the phraseology of this clause,
however, the company's right to realize under subro-
gation depends, not upon its claim that the policy is
avoided as to the mortgagor, but upon proof that it
is so." The insurance company cannot rest upon its
claim that the policy is forfeited or upon a showing
that there was reasonable grounds to believe it was
so, but only upon the fact that it was so. An insur-
ance company really does not put itself in a position to
appeal to the court's sense of justice when it utters
its policy framed in such unfair language. Insurance
policies are not drawn by men unlearned in the mean-
ing of language or unlearned in the law of insurance.
The clause in question is called in the briefs before
us and in the law books the "standard mortgagee
clause," by which we infer that it is a clause in gen-
eral use in first class insurance companies, and that
they mean what they say, that is, that they are not
liable if they claim they are not liable. If that is so
then it is an agreement to make the insurance com-
pany a judge in its own case, which is so unreasonable
that no court ought to enforce it. If on the contrary
it means what the learned law-writer last above quoted
says it means, that is, that it is proof of the fact and
not mere claim of the fact that will exonerate the in-

surer, then the clause has reason and justice to rest upon.  But if that is the correct interpretation then the words, "and shall claim that, as to the mortgagor or owner, no liability therefor existed," are unnecessary, because if the mortgagor had really forfeited right the law would adjudge the company not liable to him beyond its obligation to pay the mortgage debt even in the absence of those words in the contract.

In each of these policies is a stipulation to the effect that if the mortgagor should do certain things or if he should omit to do certain other things or suffer certain conditions to .exist the policy should thereby become null and void, but in the mortgagee clause it is said that the policy does not thereby become void as to the mortgagee, and that where that is so the insurer may pay the mortgage debt and take a valid assignment of the mortgage notes and security.  Cases are cited to show that that is a valid contract and its terms are enforced; of that class of cases is Allen v. Ins. Co., 132 Mass. 480, quoted in the briefs of respondents.  We will refer to that case again hereinafter.  It is sufficient now to say that that is not this case, but it differs in an essential point. There is a very great difference between the consequence of committing or suffering an act, for the commission or suffering of which it is stipulated that the policy shall become null and void, and the consequence of failure to make proof of loss after the loss has occurred.  All the acts specified in the policy, of commission, omission or sufferance, whereby the policy is to become void, are referable to the time when the policy was issued or the period of its running, before the fire, but among those acts failure to make proof is not mentioned.  The only consequence specified in the policy, of failure to furnish proof of loss, is to be gathered from the provision that when the amount of loss or damage has been ascertained it "shall be payable sixty days after due notice, ascertainment, esti-

mate and satisfactory proofs of the loss have been received by the company in accordance with the terms of this policy,'' and the clause requiring proof of loss to be furnished within sixty days after the fire, and: ''No suit or action on this policy, for the recovery of any claim, shall be sustainable in any court of law or equity until after full compliance by the insured with all the foregoing requirements.'' Neither of those clauses undertakes to declare the policy void for failure to furnish the proof, but the most that the insurance companies can claim for them is that they constitute a time limitation on the right of action. When the Statute of Limitation runs on a note it does not render the note void, on the contrary the note still has sufficient legal vitality to constitute a consideration for a new promise to pay; until recent legislation a mortgage might be foreclosed after right of action on the mortgage note had been barred; under some circumstances a claim may be pleaded as a setoff or counterclaim when it is barred by limitation (Turnbull v. Watkins, 2 Mo. App. 235); and other conditions might be supposed where the law would recognize vitality in a note on which the Statute of Limitations had run. The only instance under our law in which the Statute of Limitations extinguishes the subject is where the plaintiff's title to real estate is extinguished by adverse possession. Conceding for the sake of argument that Williams could not have maintained an action to recover the balance due on these policies because of his failure to furnish proof, it does not follow that after the insurance companies had paid the mortgage debt he could not have maintained a suit to cancel the mortgage as an unlawful cloud on his title; the legal consequence followed the payment of an obligation after it has been barred by the Statute of Limitations is the same as if it had been paid before.

The policies, as we have already noted, specify with great particularity certain acts and conditions whereby the insurance is to become null and void and the mortgagee clause exempts from the effect of those acts or conditions the interest of the mortgagee so far as they depend on the conduct of the mortgagor, that is, it recognizes that the insurance as to the mortgagor may become null and void for his act or neglect except as to the payment of the mortgage debt. The language of the clause is: "and this insurance as to the interest of the mortgagee or trustee, only, therein shall not be invalidated by any act or neglect of the mortgagor, or owner, of the within described property, nor by any foreclosure or other proceedings or notice of sale relating to the property, nor by any change in the title or ownership of the property, nor by occupation of the premises for purposes more hazardous," etc., indicating that the contemplation of the forfeiture of the interest of the mortgagor, while preserving that of the mortgagee, relates to the acts and conditions which would render the policy void before the destruction of the property by fire. None of those acts or conditions occurred, on the contrary the answer expressly admits that the policies were in full force and effect when the house was destroyed by fire, and the only fact they rely on to avoid their obligations is the failure of the mortgagor to furnish proof.

The answer concedes that at the time of the fire and for at least sixty days thereafter there was nothing to invalidate or to question the validity of the insurance, and if it should now be conceded that there was no waiver of the proof of loss and full force be given to the letter of the policies on that point, it would only mean that the mortgagor's right of action on the policies was barred, but in every other respect the insurance was valid. In that view of the case the mortgagor could not maintain a suit at law to recover the balance that is due (and there is a balance still

due) after payment of the mortgage debt, and could not maintain a suit in equity to compel the companies to pay the mortgagee, although the mortgagee could himself maintain an action to recover his debt and when recovered by him, or if paid to him without suit, the mortgagor could by suit in equity against him compel him to cancel the mortgage debt and clear the record. When the insurance companies without suit pay the mortgage debt and (as they have done in this case), take from the mortgagee an assignment of the notes and deed of trust, the mortgagor may maintain a suit in equity against them, not on the policies and not in their capacity of underwriters, but in their capacity as assignees and holders of the securities under their assignment from the mortgagee, and compel them to cancel the securities and clear the record. Even before the sixty days had passed the adjuster gave such assurance to the mortgagee that he had no anxiety about his debt and made no exertion either to furnish the proof himself or induce Williams to do so. We are referred to cases to show that Loewenstein as holder of the second mortgage had no standing to make any claim under the policies, but that is not a point in this case; Loewenstein is not claiming anything under the policies, he is merely asking to have a mortgage that was an encumbrance on his land, but which has been paid by those whose obligation it was to pay it, cancelled. Even a vendee under Loewenstein would have the right to have an unlawful incumbrance removed from his title.

In Traders Ins. Co. v. Race, 142 Ill. 338, the court had in hand an insurance policy that contained a mortgagee clause like the one we are now considering and the insurance company was making a claim of the same kind that is now being made, that is, a right of subrogation. Referring to the language used in that policy that if the insurance company shall claim that it is not liable, etc., the court said: ''The rights of a party

insured cannot be made to depend upon the arbitrary claim of the insurer.'' That was a stronger case in favor of the insurance companies than the case at bar, for there the house had ceased to be occupied as a dwelling before the fire and that was one of the grounds specified for which the policy should become null and void. But the court said that equity would never decree a forfeiture, therefore would not, for the purpose of subrogation, decree a forfeiture of the mortgagor's right under the policy, but that as subrogation was a doctrine of equity, to be administered only on equitable principles, the duty devolved on the insurance company not only to show that the house was unoccupied but that that condition was the cause of the fire or conduced to the destruction of the house, and the evidence not showing that consequence the court held that the mortgage debt was paid and that the mortgagor was entitled to recover the balance. Applying that equitable doctrine as to the facts of this case it devolved on the insurance companies to prove not only the failure to make proof of loss but that such failure operated to the injury of the companies. But these companies make no such pretense as that, on the contrary the evidence shows that their adjuster had in his hands a full and complete proof of loss by the sworn statement of the same person who, according to their theory, alone could make the proofs under these policies, covering the same fire and the destruction of the same house in which the household goods were located, and in addition to that the adjuster searched the conscience of the mortgagor by a personal examination and reduced his answers to writing. Even in a court of law, where technicalities prevail, the insurer could not maintain a defense to a suit on his policies on such a showing, much less can he ask a court of equity, where conscience prevails, to decree a forfeiture of the mortgagor's interest in order to enable the

insurer to foreclose the mortgage obtained under such circumstances.

Suppose after the sixty days had passed and no proof of loss had been made, Farrar, the mortgagee, had in express terms refused to accept payment of his mortgage from the insurance companies and refused to avail himself of the provision in the policy, saying that the property covered by the deed of trust was sufficient to afford him all the security he desired, could he by such refusal stand, as it were, between the mortgagor and the insurance companies and shield the latter from the payment that he could compel if he would and then turn upon the mortgaged property and foreclose his mortgage? Did the mortgagor have no right to enforce that provision of his policy because forsooth he could not maintain an action on the policy to recover the balance due him? The Supreme Court of Massachusetts answered that question in Graves v. Ins. Co., 10 Allen 281. In that case the policy provided that "if the title to said property shall be in any way changed the risk thereupon shall cease and determine," but it also provided that "no sale of the property shall affect the right of the mortgagee to recover in case of loss under the policy." The title to the property had changed before the fire and the insurance as it applied to the mortgagor's interest in the property beyond the mortgage had ceased, and after the fire the insurer paid the mortgagee the amount of the debt and took an assignment of the notes and after that the equity of redemption in the property was sold to Graves, the plaintiff in that suit. The court held that the policy belonged to the mortgagor, was obtained by him at his own cost to pay an incumbrance on his property and whatever was over to pay him for the further loss. The payment of the mortgage was as much a payment on his interest in the property as would be the further payment to him. The court said: "We are then to assume that this policy was

procured by the mortgagor at his cost, and was one which he might cause to be enforced for his benefit, and the avails to be applied, first, to discharge the mortgage debt, and the surplus to his own benefit, unless that right has been lost by alienation of his interest.. It is conceded that such alienation has been made.'' The court then goes on to discuss the right and duty of the mortgagee, saying that unquestionably he had the right to enforce the provision of the policy to the payment of his debt, but the question was, if he did not choose to avail himself of the right, could he be compelled by the owner of the equity of redemption to do so? And in that connection the court said: ''Having this available fund thus provided by the mortgagor and those succeeding to his rights, and the contingency having happened upon which he was to receive it, we think it must be held to be his duty to receive it and apply it to the payment of the debts secured by the mortgage.'' And the court said that the insurance company having taken the assignment of the mortgage was in the double aspect as assignee of the mortgage and debtor under the policy; ''the law will treat it as paid, the same hand being entitled to receive which was bound to pay.'' It was also held that the plaintiff in that suit, as the vendee of the equity of redemption after the fire (just as here), could maintain the suit. In that case it was conceded that the mortgagor's interest beyond the satisfaction of the mortgage had been forfeited because he had sold the property while the policy was running. There the mortgagee apparently had declined to avail himself of the right given him by the policy and had preferred to sell his debt to the insurance company, and here the mortgagee has in effect attempted to do the same thing.

That case differed from the case at bar, however, in this, there was no stipulation in that policy to the effect that on payment of the money to the mortgagee

the company should have an assignment of the mortgage or be subrogated to his rights. In a later Massachusetts case, Allen v. Ins. Co., 132 Mass. 480, a policy exactly in that respect like the one we are now considering was before the court and it was held that the insurance company was entitled to the subrogation as now claimed here, the court distinguishing the case from Graves v. Ins. Co., just above discussed, and saying that the policy then beng considered seemed to have been drawn expressly to meet the decision in that case, and the court interpreting this clause in the policy then before it said: "In other words, the policy provides that the amount due for a loss after a forfeiture shall not be a fund for the payment of the mortgage debt, but that, upon payment of the loss, the mortgage shall be a fund for the reimbursement of the defendant," and the court so decreed. It is difficult to see any motive that would actuate a mortgagor to go to the expense of taking out insurance to secure a debt that was an incumbrance on his property, which insurance, when paid, would enure in no sense to his benefit, but would leave the debt so far as he was concerned exactly as it was before, except that it is transferred to another person. If that is what the policy means we doubt if its equivalent could be found in any other kind of a contract, yet it is in harmony with the language in the same clause hereinabove discussed, that is, language that is susceptible of being interpreted to mean that if the insurance company claims that it is not liable then it is not liable.

But we do not feel compelled to agree or to disagree with that interpretation because the case now before us differs in a very material point from the case in which that interpretation was made. In that case the policy provided that if the house should become vacant the policy should become void; it was vacant when the fire occurred. We are referred to other cases of that kind, but none more persuasive or more in

point, therefore we do not deem it necessary to review them. After going through a great many cases cited on both sides, in our opinion the Illinois case (Traders Ins. Co. v. Race, 142 Ill. 338) above cited expresses the law on this subject more clearly than any other we have seen.

Our conclusion is that neither by the letter of the contract nor by any equitable principle are the respondents entitled to be subrogated to the rights of the mortgagee or to an assignment of the mortgage debt, therefore the judgment is reversed and the cause remanded to the circuit court with directions to enter judgment in favor of appellant cancelling the notes and deed of trust in question and dismissing the defendants' crossbill. *Gantt, Fox,* and *Woodson, JJ.,* concur; *Burgess, J.,* not sitting; *Lamm* and *Graves, JJ.,* dissent in dissenting opinion by *Lamm, J.*

## ON MOTION TO TRANSFER TO ST. LOUIS COURT OF APPEALS.

VALLIANT, C. J.—This is a motion to transfer the cause to the St. Louis Court of Appeals on the ground that this court had no jurisdiction to render the judgment it did render.

The motion goes on the theory that the only question in the case is, was the debt secured by the deed of trust paid? And in support of the motion we are referred to cases wherein we have held that where the only question was whether the debt was paid, title to real estate is not involved, although as an after consequence title to real estate might be affected. We have held in several cases where the debtor in a deed of trust sought to enjoin a foreclosure sale on the ground that the debt was paid, that title to real estate was not involved, but we have never held that a petition charging that the defendant had by an unlawful assignment obtained possession of a deed of

trust and held it as a valid incumbrance on the plaintiff's land and praying that the deed be surrendered and cancelled as a cloud on the plaintiff's title, did not involve title to real estate. That is this case. This is not a controversy between a debtor and a creditor or a dispute as to whether a debt is paid; it is a controversy between a landowner and a corporation which claims to have obtained by assignment a mortgage debt that incumbers the land, the corporation being in no sense a party to the mortgage. Plaintiff's petition does not use the word fraud to characterize the transaction between the defendant companies and the holder of the deed of trust, but it states facts that show the transaction was unlawful, and done knowingly and wilfully, and placed a cloud on the plaintiff's title, and this court so held and its judgment was that the deed of trust and notes be cancelled. Could the Court of Appeals have rendered the judgment that this court rendered if that court had reached the same conclusion as to what should be done? Could it have removed the deed as a cloud on the title?

There was no question here as to the fact that the mortgage creditor had received all the money that was due him. The question was as to right of the defendants to take an assignment of the mortgage notes under the circumstances and the right of the trustee to make the assignment.

This court has always held that in order to give jurisdiction on the ground that title to real estate is involved, the judgment itself must directly affect the title, and the distinction has been drawn between judgments that directly affect the title and judgments that may result in title being affected. In this case the judgment which this court directs the circuit court to enter is that the deed of trust be cancelled; that is a direct operation on the title.

In Payne v. Savings Assn., 198 Mo. 617, the plaintiff sought to enjoin a sale under execution on a judg-

ment which had been rendered against a person who at one time was the apparent though according to the petition not the real owner of the land; that plaintiff was the real owner and if the sale should take place it would cast a cloud on plaintiff's title. In that case the court per GANTT, J., said: "The only purpose of the bill was to obtain an injunction," and cited with approval, State ex rel. v. Court of Appeals, 67 Mo. 199, wherein it was said: "The result of the litigation may affect the title to real property, as would every suit in which a judgment could be rendered which would be a lien on real estate, but it cannot be said to involve the title."

In Gay v. Sav. & Bldg. Assn., 149 Mo. 606, the plaintiff was the maker of the mortgage or deed of trust; he sought to enjoin a sale of the mortgaged property on the ground that the debt was paid, that is, he claimed that in an accounting with defendant he was entitled to a credit of $800 which if allowed would cancel the debt; the validity of the deed was not in question or defendant's ownership of it; the court said: "In any event it is only a question of the amount of money due on the mortgage debt." To the same effect are Bonner v. Lisenby, 157 Mo. 166, and Vandergrif v. Brock, 158 Mo. 681.

In Christopher v. People's H. & S. Assn., 180 Mo. 568, the question was between the mortgagor claiming to be entitled to credits on his mortgage for certain payments which he had made, which claim the mortgagee disputed. It was held that although in consequence of a decree in that case the title to real estate might by proceedings thereafter be affected, yet the decree itself did not affect the title. We are also referred to cases wherein it has been held that suits to foreclose a mortgage or establish liens do not involve title to real estate, but they are not in point here. Of such the latest perhaps is Stark v. Martin, 204

Mo. 433. In that case Judge GRAVES said: "Neither by the petition nor by the answers is it sought to have even a mortgage or deed of trust cancelled." That is just the difference between that case and this.

The case of Turner v. Morris, 222 Mo. 21, was an action in replevin wherein it was sought to bring in a question of title to the land on which the wheat was grown, and what Judge WOODSON then said was in reference to the facts of that case, and it was in harmony with all the decisions of this court on that subject.

We have also held that though title to real estate be in issue in the pleadings, yet if the judgment appealed from was only a money judgment, title to real estate was not involved. [Jones v. Hogan, 211 Mo. 45; Brannock v. Magoon, 216 Mo. 722; Klingelhoefer v. Smith, 171 Mo. 455; Kennedy v. Duncan, 224 Mo. 661.] But in those cases the parties claiming interest in the land did not appeal from the judgment, but were satisfied with the money judgment; if they had appealed still claiming the interest in the land, this court would have retained jurisdiction. In this case, although it is a money judgment, yet it is something more than that, it is a judgment dismissing the plaintiff's bill wherein he seeks to have the incumbrance from his title removed and sustaining the defendants' cross-bill, and it was from that that the plaintiff appealed. The Court of Appeals could affirm or reverse the money judgment, but it could not render a judgment giving to the plaintiff what his petition claims he is entitled to even if that court took the same view of the law that we have taken.

Suppose the Court of Appeals should hear this case and reach the same conclusion as to the law that we have reached, and should render judgment, as we have rendered, directing the circuit court to enter a decree cancelling the deed of trust, who would undertake to defend the validity of its judgment?

In support of the motion to transfer it is said: "The validity of the deed of trust is not questioned in any manner in this suit, just as in the Christopher case." But there is an essential difference between this and the Christopher case in that particular. In that case the court said: "The object, the purpose, the validity of the deed of trust was recognized throughout the controversy by both plaintiffs and defendant." In that case the plaintiffs were the mortgagors, the defendant the mortgagee, there was therefore no question of the defendant's title to the mortgage. But here, whilst the validity of the mortgage as it was originally between the parties to it was not questioned, yet the validity of the defendants' title to it and their right to acquire it in the manner they did is the main issue in the case. The motion to transfer is overruled. *Gantt, Burgess, Fox* and *Woodson, JJ.,* concur; *Lamm* and *Graves, JJ.,* dissent.

## DISSENTING OPINION.

LAMM, J.—In this dissent I shall state the facts from my viewpoint based on a study of the record. In 1903 plaintiff lodged his bill in equity in the circuit court of St. Louis county, the object and general nature of which was to cancel and discharge the record lien of a deed of trust executed by one Hopple to Farrar, trustee, to secure certain notes. This deed of trust is often referred to and will be designated "A" for brevity. "A" conveyed part of two lots described by metes and bounds. Defendants answered by denial, by admissions, and by way of crossbill to foreclose "A." The decree dismissed plaintiff's bill, found the issues for defendants and foreclosed "A." Plaintiff appeals.

Plaintiff claims title to the ground by virtue of a foreclosure of another deed of trust, a junior lien to "A," and a trustee's deed under that sale. Defendant

companies claim title and ownership of "A" and the notes secured thereby and the consequent right to foreclose by virtue of an assignment under a mortgagee or subrogation clause in two policies of fire insurance, issued by them respectively on a building situate on the ground in question, and which policies were held as collateral security to the loan secured by "A."

The facts are somewhat complicated, but there is no dispute on the features of the case evidenced by documents, which may be summarized as follows:

Hopple owned the ground on May 29, 1901. On that day he executed a deed of trust in the nature of a mortgage to Farrar, trustee, securing a principal note of $2800, due in three years, together with twelve quarterly interest notes of forty-two dollars each, and three yearly interest notes of fifty-six dollars each, which deed of trust (to-wit, "A") was duly recorded. On that same day Hopple conveyed to one Choisel by warranty deed. This conveyance was subject to "A" and also to another deed of trust not material here. On June 14, 1901, Choisel took out two policies of insurance aggregating three thousand one hundred dollars—one-half in each of defendant companies. Each policy had a "rider" or attached clause, commonly known as a "mortgagee clause," indemnifying the owner of the indebtedness secured by "A." These policies contain the usual clause requiring proofs of loss to be made by the assured within sixty days after a loss by fire, which provision, together with the mortgagee clause, will be sufficiently elaborated presently.

"A" contained a provision that the property should be kept insured at all times and that the policies be kept "constantly assigned or pledged and delivered" to Farrar, trustee, as security for the notes. The policies were delivered to and thenceforth held by Farrar in pursuance of that provision. On the 20th day of July, 1901, Choisel sold and conveyed by warranty deed to Zackery T. Williams and Priscilla, his

wife, subject to "A," and said policies were (with consent of defendants) transferred to Zackery and Priscilla by written assignment. On the same day, to-wit, July 20, 1901, Zackery and Priscilla executed a deed of trust (hereinafter called "B") to a trustee to secure an indebtedness to said Choisel and the same was duly spread of record. "B" was in terms subject to "A," and nothing was said therein about insurance so far as the abstract shows. On the 14th of June, 1902, "B" was in default and was foreclosed by public sale. Plaintiff was the highest bidder at the foreclosure sale and the real estate was knocked down to him and a trustee's deed followed which was duly spread of record. The record does not show that plaintiff, Loewenstein, was owner of the notes or had any interest in "B." He is a purchaser under a second deed of trust sale. Whatever equities he acquired, he acquired then, and not before. Prior to that, *viz.*, on the 29th of January, 1902, the building insured by defendants' policies was destroyed by fire—all of which plaintiff knew when he took his trustee's deed. It seems there was another policy of insurance covering chattels issued to Zackery T. and Priscilla by another under-writer and that there was a loss under this policy by the same fire. Zackery and Priscilla at once employed Senator Kinealy as their attorney to attend to proofs of loss under all three policies and collect the insurance. They had no other agent or representative. To this end blank proofs of loss (as provided by statute) were promptly furnished by the insurance adjuster representing the three under-writers, that is, duplicate blanks for each policy. Proofs of loss were duly furnished by the assured on the chattel policy, but no proofs were furnished under the policies on the building issued by the defendant companies.

It was contended below, *inter alia*, as it is here, that there was a waiver of proofs of loss and that

the right of the insured to recover on the policies was kept alive. On that head we shall not set forth the testimony. At most the evidence tending to show a waiver was faint. On the other hand there was cogent testimony from plaintiff's own witnesses, as well as from defendants', tending to show there was no waiver, that defendants were standing on their policy terms, and that Zackery T. and Priscilla, acting under the advice of their said attorney, of set purpose abandoned proofs of loss under the policies issued on the building by defendants and abandoned all claims under their policies. Any other facts on this phase of the case necessary to determine the point will appear presently.

On the coming in of proofs of loss on the chattel policy an adjustment was negotiated and that policy was compromised and paid to Zackery T. and Priscilla through the services of Senator Kinealy.

At a certain time after proofs of loss were due, Mr. Farrar, trustee under "A," who at that time for the purposes of settlement also held legal title to the notes secured by "A," demanded a settlement from defendant companies under the mortgagee clause. His right to make such demand was recognized by the adjuster. In turn the adjuster claimed the right of defendant companies to have the notes and security evidenced by "A" assigned to them. This, on the theory that Zackery and Priscilla had no claim under the policies. On this basis a settlement was made. Defendant companies paid Farrar the amount of the notes secured by "A," to-wit, $2930, with interest; and Farrar indorsed to them said notes without recourse. At the same time he executed the following written assignment:

"St. Louis, Mo., June —, 1902.

"For value received I hereby transfer, assign and set over to the Queen Insurance Company of America and the Phoenix Assurance Company of London, all

my right, title and interest in all the securities held by me for the payment of any debts due me by Zackery T. Williams and Priscilla Williams, or either of them, hereby subrogating to said insurance companies all my rights under such securities.''

And delivered the notes, mortgage, policies and assignment to the adjuster on June 6, 1902.

Policy provisions touching proofs of loss were the same in each. They need not be set forth *in extenso*. In substance they are: (1) A provision that the policy loss shall be payable sixty days after due notice, ascertainment, estimate and satisfactory proof of the loss have been received by the company in accordance with the terms of the policy; and (2) another provision to the effect that the insured should give immediate written notice to the company of loss by fire and within sixty days render a statement to the company signed and sworn to by the insured, stating the knowledge and belief of the insured as to the time and origin of the fire, the interests of the insured and of all others in the property, any incumbrance, any other insurance, and many other things.

The mortgagee clause attached as a rider to each policy reads:

''Loss or damage, if any, under this policy, shall be payable to Bernard C. Farrar as mortgagee (or trustee), as interest may appear, and this insurance, as to the interest of the mortgagee (or trustee) only therein, shall not be invalidated by any *act or neglect* of the mortgagor or owner of the within described property, nor by any foreclosure or other proceedings or notice of sale relating to the property, nor by any change in the title or ownership of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by this policy. Provided, that in case the mortgagor or owner shall neglect to pay any premium due under this policy, the

mortgagee (or trustee) shall, on demand, pay the same.

"Provided also, that the mortgagee (or trustee) shall notify this company of any change of ownership or occupancy or increase of hazard which shall come to the knowledge of said mortgagee (or trustee) and, unless permitted by this policy, it shall be noted thereon, and the mortgagee (or trustee) shall, on demand, pay the premium for such increased hazard for the term of the use thereof; otherwise this policy shall be null and void.

"This company reserves the right to cancel this policy at any time as provided by its terms, but in such case this policy shall continue in force for the benefit only of the mortgagee (or trustee) for ten days after notice to the mortgagee (or trustee) of such cancellation, and shall then cease, and this company shall have the right on like notice, to cancel this agreement.

"Whenever this company shall pay the mortgagee (or trustee) any sum for loss or damage under this policy and shall claim that, as to the mortgagor or owner, no liability therefor existed, this company shall, to the extent of such payment, be thereupon legally subrogated to all the rights of the party to whom such payment shall be made, under all securities held as collateral to the mortgage debt, or may at its option, pay to the mortgagee (or trustee) the whole principal due, or to grow due on the mortgage with interest, and shall thereupon receive a full assignment and transfer of the mortgage and of all such other securities; but no subrogation shall impair the right of the mortgagee (or trustee) to recover the full amount of its claim."

Defendants claim to own "A" and the notes secured thereby by virtue of the foregoing mortgagee clause and assignment; *contra,* plaintiff, as owner under the foreclosure of "B" and the trustee's deed following, claims that defendants' payment to Farrar,

trustee, operated in equity as an extinguishment of the notes secured by "A," and that he is entitled to have the record lien of "A" discharged.

We have carefully examined the record and have reached the conclusion that plaintiff's bill was properly dismissed and that the decree of foreclosure on the crossbill accords with correct and settled legal principles. This, because:

(a) It must be conceded that the lawmaker, because of the importance of insurance contracts and the intricate nature of the subject-matter, has evidenced a lively concern in regulating insurance companies and their contracts. This is not singular when the technicalities of the business are considered and when experts usually represent the insurer, while the assured as a rule does not stand on an equal footing. Courts have not been laggard in keeping pace with the lively concern of the lawmaker. Policies are contracts prepared by skilled and astute people and accepted by plain folk, the unwary and confiding. Therefore, they are construed somewhat strongly against the insurer. Such policies swarm with intricate technical provisions hedging about liability or looking to its avoidance, and courts are inclined to match their judicial astuteness to avoid a forfeiture against the astuteness of the policy-maker to invent or establish one. This judicial attitude may be gathered from cases. For example:

In Boyle's Sons v. Insurance Co., 169 Pa. St. l. c. 355, Mr. Justice WILLIAMS commenting on a policy, says: "Arranged around this contract is a line of defensive 'stipulations, exceptions, conditions and provisions.' Some of these are not numbered, but with others numbered from 1 to 112 inclusive, they stand bristling like armed sentinels around the contract and the liability of the company thereunder, ready to impale even an honest claimant on a bare technicality."

And, as pointed by learned counsel for plaintiff, in Dezell v. Fidelity and Casualty Co., 176 Mo. l. c. 265 *et seq.*, this court, speaking through VALLIANT, J., held language directed to life insurance but not inapplicable to fire, *viz.*: "Courts do not favor forfeitures, nor do they favor the defeat of a meritorious cause on any purely technical ground. Insurance companies have probably realized that fact more clearly than any other class of business concerns. . . . And not only have the Legislatures exerted their authority in such matters, but the courts of the country also have strained the discretion that lies in the scope of judicial interpretation to prevent a forfeiture of the insurance. Sometimes the reasoning of the court in such case is so technical that to the mind of the layman it but thinly disguises the praiseworthy determination to do justice in that particular case in spite of the letter of the contract."

We are asked to apply the doctrine of the Dezell case. We are quite willing to do so. But that or no other case holds that a waiver can be seen where none exists. Courts have held under a general charge in a petition of full performance of policy conditions, where defendant pleads the non-performance of a specific policy term, that plaintiff may show a waiver without pleading one, this contrary to the general rule of pleading. Yet the general doctrine is that the requirement of proofs of loss is a fair and reasonable requirement, one intended to sift and purge the conscience of the assured and necessary to protect the insurance company from fraud and imposition, and that such policy provision must be substantially complied with. We know of no ruling to the effect that policies, such as these, are kept in force in favor of the property-owner unless proofs of loss are furnished by him or waived by the company.

(b) In this case it is conceded no proofs were furnished by the property-owner. Were they waived?

We think not. The adjuster represented all three of the insurance companies and furnished blank forms for proofs when notified of the fire to the right parties, *viz.*, Zackery, Priscilla and their attorney. There is substantial evidence tending to show the adjuster was standing on the policy right to have proofs of loss. The insured and their attorney so understood his attitude. Accordingly they furnished complete proofs of loss·on one policy covering the household furniture. After a somewhat extended negotiation that policy was compromised. It seems that unknown to and without any suggestion from the adjuster, the Williamses and their attorney opened negotiations with those representing "B," the second deed of trust. The plaintiff at that time was the agent for the holders of the paper secured by "B." The Williamses were ready to go to the trouble and expense of furnishing proofs of loss and collecting all the insurance, but, as they had no interest in the insurance on the building (as they looked at it), it being held as collateral security under "A" and the amount of surplus being very small, they wanted a rebate on the second mortgage sufficient to remunerate them for the expense and trouble of collecting that insurance. The people interested in "B" refused aid by way of rebate or concession. Thereupon, Senator Kinealy and his clients, on their own initiative and without any suggestion of the adjuster or any other agent of defendants, of set purpose abandoned their claim under the house policies by refusing and failing to make proofs of loss, although the adjuster had furnished the blanks and Senator Kinealy had got possession of the policies from Farrar for the purpose of making such proofs. When they came to this conclusion the policies were returned to Farrar where they belonged. There is some testimony to the effect that Mr. Loewenstein, feeling an interest in the insurance, saw and talked with the adjuster. He puts one construction on these conversations. The

adjuster puts a contrary construction on them. If there was any waiver in the case it arises on those conversations. If the chancellor, considering that evidence and the other facts in the case, chose to believe the adjuster, we ought not to interfere because he is better equipped than we are to pass upon disputes in evidence. Neither Zackery nor Priscilla testify. Senator Kinealy does testify, and the deciding weight of the testimony is against a waiver of proofs and in favor of abandonment.

While a waiver is not a technical estoppel, yet it is closely related to estoppel and has elements of it. Says BROWN, J., in Armstrong v. Insurance Co., 130 N. Y. 560: "The rule is now established, however, that if in any negotiations or transactions with the assured after knowledge of the forfeiture, it recognizes the continued validity of the policy, or does acts based thereon, or requires the insured to do some act or incur some trouble or expense, the forfeiture is waived." And further in the same case: "As has been already said, in every case where a waiver has been implied from the defendant's acts, there has existed something of the element of an estoppel. The plaintiff has been misled to his harm, or the company has done something which could be done only by virtue of the policy, or has required something from the assured which he was bound to do only at the request of the company and which request could only be made under a valid policy."

The foregoing we deem a fair statement of the law. If in this case defendant companies on uncontradicted evidence, or on evidence which (if contradicted) the chancellor believed, had taken such position in regard to the proofs that the insured was misled on the necessity of making them, we would have a different case. The most the adjuster did in this case, under the weight of the testimony, was to sit tight and do nothing after furnishing blank forms of proofs

of loss. It will not do to say that such course is a waiver, nor will it do to contend that those who adopt a line of policy for their own purpose or of their own wish can be said to have taken their position because of waiver. The chancellor found specially against a waiver and so wrote it down large in his decree. We think his finding well-bedded in the facts.

(c) The right to subrogation to mortgage securities has been discussed in cases where there are no such mortgagee clauses as those in hand. For instance, where policies simply provide that loss, if any, is payable to a mortgagee or trustee as his interest may appear, and in other cases of similar kind. In such cases the courts have refused subrogation, and a payment to the mortgagee or trustee has been held to extinguish the notes and mortgage lien by operation of law. We are cited to some such cases but they are not in point. Under such mortgagee clauses as were attached to defendants' policies the clear right to subrogation and assignment exists by the very terms of the contract in case the insurer is not liable to the insured under the policy but remains liable to the mortgagee or trustee by virtue of the policy terms. The claim of non-liability to the insured must not be merely arbitrary, colorable or whimsical, but based on fact. [Traders' Insurance Co. v. Race, 142 Ill. 338.]

In the case at bar non-liability actually exists. That fact entitled the underwriters to claim an assignment and stand on the doctrine of subrogation as provided in the contract of insurance; for, although the insured paid the premium, yet that premium was the consideration for a contract having dual features, *viz*: It insured his property against loss, but it also insured the mortgagee's debt against loss, and it contemplated that a condition might arise in which it would insure the mortgagee and no longer insure the property-owner. That condition arose in this case and under an unquestioned line of authorities the mortgagee clause was

valid and operative. [Ordway v. Chace, 57 N. J. Eq. 478; Springfield Fire and Marine Insurance Co. v. Allen, 43 N. Y. 389; Badger v. Platts, 68 N. H. 222; Ulster County Savings Institution v. Leake, 73 N. Y. 161; Foster v. Van Reed, 70 N. Y. 19; Alamo Fire Insurance Co. v. Davis, 25 Tex. Civ. App. 342; Gillespie v. Insurance Co., 61 W. Va. 169; Adams v. Insurance Co., 115 Mo. App. 21; Allen v. Insurance Co., 132 Mass. 480.]

(d)  It is argued that the mortgagee clause contemplates, as a condition precedent to assignment, a forfeiture sprung before a loss by fire. Further, that it was the duty of the mortgagee to make proofs of loss; that such proofs would have answered for the assured; that the settlement with Farrar, trustee, is therefore equivalent to a waiver of proofs of loss. But learned counsel argue unsoundly, we think, in that behalf, because:

(1)  The mortgagee clause is not restricted to forfeitures springing up before the loss. The words do not run that way, but plainly cover all acts making the insurance inoperative as to the assured, and leaving it alive as to the mortgagee. That clause reads, *inter alia,* that the insurance as to the interest of the mortgagee or trustee "shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property." It would be unnatural and strained construction to say the clause did not cover the property-owner's failure to furnish proofs of loss. We rule the contention against plaintiff.

(2)  As to the mortgagee's furnished proofs of loss, this may be said: It has been ruled by the Kansas City Court of Appeals that the mortgagee could not *maintain an action* on the policy without proofs made by either the assured or the mortgagee. [Lombard Investment Co. v. Insurance Co., 62 Mo. App. 315.] It has been ruled by the same court that the mortgagee need not make proofs of loss. He may make them or let it alone. [Adams v. Insurance Co., 115 Mo. App.

21.]   In Maine (under a statute) it was ruled that a mortgagee could not maintain an action until proofs of loss were made.   [Nickerson v. Nickerson, 80 Me. 100.]   It has been ruled in Georgia on an action by the mortgagee against the company that proof of loss by either the mortgagee or the assured was a condition precedent to recovery.   [Southern Home Building and Loan Association v. Ins. Co., 94 Ga. 167.]   And in Massachusetts it was ruled in a late case (Union Institution for Savings v. Insurance Co., 196 Mass. 230), in a suit by the mortgagee upon the policy, that while the mortgagee from necessity could not make the proofs of loss contemplated from the assured, yet it was necessary for him to make such modified and scant proofs as possible for him to do.

It must be admitted that the law in that particular is in a fluid and formative state and possibly the last word has not been spoken.   We think it clear, however, that while proofs furnished by the assured under the policy scheme would be all the proofs necessary to entitle the mortgagee to recover by suit in those jurisdictions requiring proofs of loss as a condition precedent to recovery on the policy by the mortgagee, yet proofs by the mortgagee himself, under his oath and on his personal knowledge, could not take the place of that sifting and purging of the conscience to which the insurer is entitled from the owner of  the  property. Therefore, a waiver of proofs of loss from the mortgagee could not be taken as a waiver of proofs from the assured.   It follows that the insurer has the right to voluntarily recognize its liability to the mortgagee without thereby admitting liability to the property-owner.   [Burnham v. Insurance Co., 75 Mo. App. l. c. 401 *et seq.*]

The necessity of proofs to maintain a suit on the policy by the mortgagee is a question not in this case, and is therefore reserved.

Moreover, if it be conceded by way of argument that proofs of loss from the mortgagee were necessary in this case to fasten liability, then, in that event, defendant companies stood altogether free and acquit when they took an assignment of "A" and the notes secured thereby. In such case subrogation in a strict sense is not a necessary element in a suit to foreclose "A." It could proceed on purchase and assignment of the notes.

Finally, to sum up, the grounds of this dissent are that:

(a) The opinion of my learned brother VALLIANT proceeds on an assumption of fact unwarranted in this record, as I read it, *viz.*, that Loewenstein, at the time he purchased at the foreclosure sale, was the owner of the notes secured by the second deed of trust.

(b) The evidence on waiver fell from the lips of witnesses below, none of it was documentary. At best it was conflicting, therefore, there being the factor of credibility to be reckoned with, the chancellor's opportunity for weighing that testimony and tagging it with a value mark was superior to our own. He did weigh it and found against plaintiff. To overrule his decision on that question of fact seems to me contrary to the long-established and sound rule of this court—a rule announced over and over again early and late, that we, in such conflict, defer to the trial judge.

(c) True, subrogation is a doctrine of equity, arising as pure benevolence to seek and do justice in a given case. It is judge-made law. But when even so much had been said as that, is it sound doctrine to rule that subrogation may not be specifically contracted for and that a contract, like the mortgagee clause we are considering, adds nothing to itself by the use of the word "subrogation," as held in the principal opinion? Here were three people entering into a solemn contract to the effect that in a certain contingency one of the parties might be subrogated to certain rights in certain

securities. Is such a contract immoral? Is it against public policy? Were the parties not *sui juris* and capable of contracting? Was the contract not clothed with a sufficient consideration? If so, why may we not labor to enforce it if the contingency happens? A valid contract may be said to be a law between the parties—the parties making their own rule of subrogation.

There are lurking dangers in insuring mortgaged property. There are still greater lurking dangers in insuring the mortgagee's interest and making the insurer responsible to the mortgagee in spite of the act or neglect of the owner of the property. These mortgagee clauses aid business, they facilitate the investment of money, tend to lower the rate of interest, and meet a business want; therefore, while insurance policies should be liberally construed in the interest of the insured yet we have no call to ignore or overcome the plain meaning of the contract words, but should enforce the contract as written.

(d) The contract does not say that the policy must be "null and void" before subrogation takes effect. To the contrary, it speaks of the "act or neglect" of the owner as the thing not affecting the mortgagee. It speaks of the *"insurance"* not being *"invalidated."* Suppose the mortgagor declined to make proofs of loss, does not the mortgagee clause provide against *that* contingency when it speaks of the *act or neglect* of the owner? I think so. This shows it was not *forfeiture* and *null-and-voidness* which were alone held in mind. Therefore I dissent from my brother's opinion in so far as it holds that the mortgagee clause only relates to those acts which forfeit the policy prior to the loss by fire.

(e) In effect and in a roundabout way the result reached is to allow a recovery on the policy of insurance without proofs of loss. Therefore, I dissent on that ground. If Williams could not recover as the

owner at the time, neither can the plaintiff who is the present owner through standing in Williams's shoes. If the policy could not be recovered on directly by suit, then to take the proceeds of the policy to apply to the payment of Williams's debts, in spite of the prior appropriation of the proceeds under the policy terms, is but to move in a circle instead of in a straight line to the same result.

For these considerations, the judgment should be affirmed. *Graves, J.,* agrees with me in these views.