## CONSTANTINE S. CUMMINGS, Appellant, v. HERBERT L. PARKER et al.

### Division One, May 31, 1913.

1. **FRAUD: Proof.** However hard to prove, fraud must still be proved, and will not be permitted to rest on mere suspicion or conjecture.

2. **———: Selling Corporate Property.** A sale by a hunting club corporation of its only remaining real estate, at a price in excess of its value, as a result of a meeting of its 26 living stockholders, including plaintiff, at which 23 voted for the sale, to another corporation whose stockholders were the same men except plaintiff, at a time when it could no longer lease a large body of land it had theretofore for twenty years used, in connection with said club house, for fishing and hunting by its members, and could obtain no other like land, being in pursuance of an apparent call of necessity, is free from all circumstances and indicia of actual fraud.

3. **———: ———: Trustee: Rescission of Contract.** Directors of a corporation stand in the relation of trustees to the corporate property; and when, on the complaint of a stockholder, the issue is whether a transaction between corporations having interlocked boards of directors should be avoided and profits therein accounted for, such dealings will be judicially eyed with jealousy and sternness to search out and correct lurking and covinous fraud; but that rule does not require that a sale of a corporation's real estate, at a price in excess of its value, where everything was open and above-board, and made in apparent necessity, should be avoided.

4. ————: ————: **All Properties: Unanimous Consent.** The general doctrine of the law, guardedly put as subject to modification, that a corporation that is a going concern, solvent and not pressed with debts, laboring under no vital distress, cannot during its charter life, without the unanimous consent of its stockholders, dispose of all its corporate property from which it derives its income and which forms the basis of its business operations, does not apply: *first*, where the complaining stockholder does not object to any sale, but to a sale to a certain other corporation and insists on a sale to a company of his own choosing; *second*, where the corporation is not in fact a going concern, but, because of inability to renew leases necessary to its corporate purposes, faces a crippled condition; *third*. where the sale has been made, and it is impossible to restore the *status quo*, and it is not apparent that it can pay back the price received; and, *fourth*, where there is not bad faith, and its application would restrain the right of a majority of the stockholders to rule within the bounds of reasonable grounds.

5. ————: ————: **Selling to Self: Rescission.** Absent any actual fraud, a transaction between two corporations, whereby one sells its real estate to another, will not, on the complaint of a minority of non-consenting stockholders, be rescinded solely on the ground of unity in directors, or unity in the voting power of stockholders, or because of interlocked directorates. Although the two corporations have the same directors, and the stockholders of the one are almost unanimously the stockholders of the other, yet they are separate entities, separate juristic persons, and the vendor is not a person selling to himself within the usual meaning of the rule.

Appeal from St. Charles Circuit Court.—*Hon. James D. Barnett*, Judge.

AFFIRMED.

*M. McKeag* for appellant.

(1) Under the pleading and testimony, plaintiff's interest was intentionally and fraudulently attempted to be disposed of by the directors of defendants, for their and their associates' benefit and profit, in the Dardenne Shooting Club; that in making this deed the result if it is permitted to stand, is to benefit these di-

rectors and their associates and injure the plaintiff. There is in this state of affairs palpable fraud in the transaction. Hopkins v. Williams, 58 Mo. 201; Thoronton v. Irwin, 43 Mo. 163; State ex rel. v. Ross, 118 Mo. 69; King v. Moon, 42 Mo. 551; Hawley v. Cramer, 4 Cowen, 717; Ward v. Davidson, 89 Mo. 445.    (2) The directors of the Game and Fish Club were trustees and representatives of all of the stockholders, plaintiff included. How honestly and fairly they took care of his interest in this corporation, the testimony too plainly shows. It was their duty to preserve the property of this corporation for the uses and purposes for which it was purchased, for the minority, as well as the majority stockholders.    They could not legally transfer its entire property, which formed the basis of the objects for which it was erected, to a corporation of which they were members and by which it resulted in their private gain without the consent of the plaintiff. Hannerty v. Theatre Co., 109 Mo. 310; Feld v. Investment Co., 123 Mo. 613; Hill v. Gould, 129 Mo. 106; Packet Co. v. Davidson, 95 Mo. 467; Bent v. Priest, 86 Mo. 475.    (3) The conditions apparent from the testimony of the Dardenne Game and Fish Club called for the intervention of a court of equity and the appointment of a receiver to wind it up under the statute made and provided to govern the dissolution of corporations. The defendants and their associates had it in their power to seek a legal remedy, the plaintiff has not any remedy at law, the defendant directors are not the proper persons to wind it up, and the court ought to have appointed a receiver and directed him to proceed under the law and wind it up. Secs. 977-981, R. S. 1899; Soulard v. St. Louis, 36 Mo. 546; Grover v. Investment Co., 138 Mo. 408.

*Ferriss, Zumbalen & Ferriss* for respondents

(1)    There was no evidence tending to show any actual fraud in the transaction. (2) The right and in-

terest of the Game and Fish Club in and to the shoot-ing grounds having terminated by the expiration of its lease thereon, it was competent for a majority of the stockholders to sell the remaining property, which had been acquired and used merely as an adjunct to the shooting grounds, notwithstanding the protest of the plaintiff. Tanner v. Railroad, 180 Mo. 1; 2 Cook on Corporations (5 Ed.), sec. 670, p. 1554; Bartholo-mew v. Rubber Co., 69 Conn. 521. (3) The sale hav-ing been authorized by a majority of the stockhold-ers, at a stockholders' meeting, is not constructively fraudulent by reason of the fact that the stockholders who voted for it were also members of the purchasing corporation. Nye v. Storer, 168 Mass. 53; Bjorngaard v. Bank, 49 Minn. 487; Steel Corporation v. Hodge, 64 N. J. Eq. 807; Alexander v. Williams, 14 Mo. App. 13; Kitchen v. Railroad, 69 Mo. 224; Bank v. Iron Co., 97 Mo. 38; Hill v. Gould, 129 Mo. 106; Butler v. Land & Mining Co., 139 Mo. 467; Oil Co. v. Marbury, 91 U. S. 587; Hill v. Nisbet, 100 Ind. 341; Copsey v. Bank, 133 Cal. 657; Rogers v. Railroad, 33 C. C. A. 517; Gamble v. Water Co., 123 N. Y. 91; Transportation Co. v. Beatty, 12 App. Cas. 589.

LAMM, J.—This is a suit in equity at the instance of a stockholder to set aside a conveyance made by one corporation to another and to appoint a receiver and wind up the affairs of the grantor corporation. From a judgment for defendants on the merits at a trial before Judge Barnett as chancellor in the St. Charles Circuit Court, after hearing plaintiff's evi-dence alone, plaintiff appeals.

Two corporations are involved, one we will call Fish Club, the other Shooting Club—a certain Realty Company also figures in the record (whether it has stockholders or is incorporated is dark). The Realty Company is not sued, Fish and Shooting Clubs are par-ties defendant, the individual defendants are the di-

rectors of Fish and Shooting Clubs (the personnel of each directorate being the same). Plaintiff is a stockholder in Fish Club and is a "member" of Realty Comnany, but is not a stockholder in Shooting Club.

At a certain time in 1908, Fish Club made a conveyance of its club house on the banks of the Mississippi, with its appurtenances, to Shooting Club. It is of that conveyance plaintiff complains, fraud being the gravamen of his cause of action.

No assignment of error here calls for the reproduction of the pleadings, hence the case may proceed on appeal on the theory they were sufficient to permit the introduction of the evidence and grant relief, if fraud was approved.

On the facts, the case is this:

In 1888 one Gallagher owned, say, eighteen hundred acres of land and water in St. Charles county, which, we will assume, were likely for fishing and hunting. At that time about thirty hunting and fishing gentlemen of St. Louis, including plaintiff, with an eye to that tract and presumably clubable men, took stock in and organized a corporation, named the Dardenne Game and Fish Club, with a capital at the outset of $5000, divided into twenty-five shares, presently increased to $6000, divided into thirty shares, with the charter purposes following, to-wit: "To purchase, obtain, lease, own, control, sell or otherwise dispose of such tract or tracts of land, or spaces of water as might be suitable for wild or tame birds, game, animals and fish; also such licenses or privileges for hunting, shooting, fishing, catching or preserving such birds, game, animals and fish on suitable lands or waters; to stock such land and waters, and acquire and enjoy the product and profit thereof; to acquire, buy, build, lease and have, in connection with such lands and waters, houses, boats or other appropriate conveyances and appliances; to keep and maintain a club house or club houses at the city of St. Louis or where said lands and

waters may be, with all suitable sustenance, furniture and comforts for the use of the members thereof; and to control all of the property and business of the corporation by such by-laws, rules and regulations as it might adopt, or authorize the directors to adopt, including making of assessments for yearly dues, not to exceed $100 on each member for one year, with all powers conferred by law or incident thereto."

Pursuant to those charter purposes Fish Club bought from Gallagher a little the rise of two acres of land adjacent to his 1800-acre tract, and at the same time leased from him the latter tract, or at least the exclusive hunting and fishing rights thereon, for a term of ten years. The fish was theirs and the game was theirs—provided they could take the one or shoot the other, a distinction with a difference, as shrewd observers have remarked. Fish Club paid $300 for the two acres and took a deed. By its lease it contracted to pay a rental on the Gallagher 1800-acre tract of $600 a year. Presently it built a club house and appurtenant out-buildings on the two acres at an outlay of, say, $3000, and became the owner of some boats and other fishing and hunting incidentals.

For the ten years next following, Fish Club kept and performed its lease with Gallagher, and as headquarters for its corporate purposes occupied its club house. At the end of its first term, the Gallagher lease was renewed for a like term with like conditions and the renewed lease was also kept and performed by Fish Club. The second term expired in 1908, and at about that time Realty Company was born; whether (as said) it was a corporation issuing stock to its members or was some form of unincorporated voluntary association, we do not know. Neither its capital, purpose nor organization is disclosed. With some few exceptions, the members of this Realty Company (including plaintiff) were also stockholders of Fish Club. At or before the expiration of the term of said renewed

lease, this Realty Company became owner in fee of said 1800-acre tract by purchase from its then owner. At about the same time the other corporate defendant, the Dardenne Shooting Club, was organized. Its capital stock is not disclosed nor are its corporate purposes defined. But the case travels below and here on implied concessions that the latter ran on the lines of those of Fish Club. With a few exceptions (one of whom was plaintiff) it had the same stockholders.

Outside the testimony of the one witness, put on the stand by plaintiff, there was no oral testimony introduced. Read into the case, during the progress of this witness's testimony, were certain instruments, to-wit, leases and deeds (the terms of which have been sufficiently stated already) and the proceedings of one stockholders' meeting of Fish Club (of which more hereafter), together with the proceedings of its board of directors of a certain date.

The case on some phases was darkly developed. Doing the best we can with the record, we take the facts to be that at some time in the history of Fish Club, near the close of the renewed lease, a question arose what it should do with its two acres and its club house appurtenances. This in view of the fact that for reasons wholly dark Fish Club either could not, would not, or did not, get a renewal of the lease on its fishing and hunting preserves, now owned by Realty Company, and the question was (not whether it would sell at all, but) whether it would sell to Realty Company or to Shooting Club. It seems, too, that the Realty Company at some time let the fishing and hunting privileges on the 1800-acre tract to the Shooting Club. But *when* and *why* this was done are wholly left to conjecture. No attempt was made to enlighten us. It does appear that at said stockholders' meeting of the Fish Club plaintiff wanted the sale made to Realty Company and that the other members of Fish Club

wanted it made to Shooting Club. This appears from a discussion at the stockholders' meeting, faintly outlined in the minutes. Whether Realty Company would not let the preserves to Fish Club, but preferred to lease to Shooting Club, or whether Fish Club did not want to lease its old preserves from its new owner, Realty Company, is also left to conjecture only. There is not a ray of light thrown by the testimony on that question. (The witness introduced by plaintiff, Mr. Goddard, one of the defendants, said Fish Club could not get its lease renewed and the investigation stopped, plaintiff resting content at that point.) Why plaintiff was not a stockholder in the Shooting Club is also left to be guessed. Was it of choice or necessity, of whim or principle? All is dark.

The sequel was that Fish Club presently conveyed to Shooting Club for $4550. The evidence put in by plaintiff unmistakably shows that this price was in excess of the actual market value of the property. The method of getting at this price seems to have been to take the outstanding shares of stock in Fish Club, then 26, and multiply 26 by 175. It was shown, and remains uncontradicted, that $175 was the highest price Fish Club shares of stock about that time had sold at and it seems several transfers were made at that figure around that time. Fish Club was out of debt, its club house was in fair repair, but the premises, out-buildings and appurtenances were somewhat run down at the heel at the time of the sale. Before the conveyence was made, a meeting of the stockholders of Fish Club was duly called for the purpose of settling the question of a sale. That was the stockholders' meeting hereinbefore referred to, of which the record holds the minutes. Of the shareholders one or more were dead. Of the 26 remaining, 23, including plaintiff, voted and all but him voted to sell to Shooting Club. Plaintiff, as said, wanted to sell to Realty Company and opposed the sale ordered made. But he introduced no

testimony tending to show that Realty Company had
either disposition or financial ability to buy, or was
authorized by charter, if it had one, or by its articles
of association, if it had any, to buy.  Fish Club stock-
holders, having authorized the conveyance to be made,
it was presently made in due form by further order of
its board of directors and plaintiff, as said, sues to
annul that conveyance, appoint a receiver and wind up
the affairs of Fish Club.  His bill was so drawn as to
let other stockholders in at their choice, but none ac-
cepted the invitation and came in.

In view of the shadows in the record, the follow-
ing colloquy between court and counsel is of some value
in getting at the theory of the trial chancellor in cast-
ing plaintiff, and his estimate of the evidence, to-wit:

"The Court:  This case seems to me to take this
position, gentlemen: the evidence shows that this Game
& Fish Club was organized under the general law as a
business corporation, but that it was substantially
operated for the purposes of the pleasure of the mem-
bers, in using this two or three acres that constituted
the club grounds as a sort of headquarters, but using
practically and mainly the eighteen hundred acres that
was leased; that seemed to be the whole occupation.
Now, the lease expires in October, 1908; that left the
club with only the two or three acres, with the club
house and houses, but substantially no ground over
which they could hunt or fish—

"Mr. McKeag:  The river was there.

"The Court:  They had the river, yes; but the
material ground they had before, by the expiration of
the lease, was about to disappear from them.  Now,
in that condition the members, who made up practi-
cally the whole of this body, organized apparently two
new corporations with some slight change of member-
ship; one a Realty Company; its purpose was not dis-
closed by the evidence at all, except apparently it be-
came the owner of the land owned by Gallagher, and

the Hunting Club or Shooting Club acquired the right to use this land that had been before leased. Now that left the original Game & Fish Club simply stranded on this two acres of land which they owned. Now, it doesn't seem to me that in that condition, in view of the evidence that's here, this case has been made out. There's no evidence of any fraudulent act as concerning this plaintiff; there's no explanation whatever in this record as to why he was not a member of these various clubs. For anything that appears in this testimony he may have kept out of these other corporations for reasons of his own; he might have kept out for many reasons entirely proper; there's nothing to indicate he was kept out in any fraudulent or improper manner; he simply didn't belong. Here's the Game & Fish Club, having property that by the records had apparently cost them originally some five or six thousand dollars, and that property was sold for $4500; the only evidence of present value at all is the estimate of the single witness, who values the property at $3500; certainly it could not be held that under that evidence there could be any fraud whatever, so far as the immediate sale is concerned; the property brought its full value, so far as the evidence shows; certainly so close to its original cost that the difference would not be of sufficient importance to be considered as fraudulent in any view of the case; it seems to me that the plaintiff in this testimony has totally failed to make out a case.

"Mr. McKeag: Your Honor, fraud may be inferred from the very fact they sold to themselves; not necessary to prove fraud. . . .

"The Court: I think the rule as to the two corporations acting with the same substantial membership and same substantial directory is not a matter of express fraud in itself; that would be a very violent supposition, but at the most it would be simply, not an evidence of fraud, but simply a condition of affairs

that would require the court to scrutinize the transactions with unusual care, but behind that, before a transaction when scrutinized could be condemned, it would have to appear that the transaction was either fraudulent in fact, or that the circumstances that surrounded it were fraudulent as to the particular individual, or unduly oppressive, but nothing of that kind appears in the record.

"Mr. McKeag: Does your Honor hold they can substantially wind up the corporation by disposing of all its property?

"The Court: This evidence simply shows they sold their land and other property for $4500; for anything the court knows they may take that $4500, and go further down the river and buy another place where they would have all the facilities they lost by reason of their inability to secure the lease; they may never dissolve the corporation; they may operate it.

"Mr. Zumbalen: They have a right to dissolve if they choose to.

"The Court: They can dissolve, but taking the evidence as it stands, there's nothing to prevent buying another club house."

On this record, the decree stands for affirmance. Because:

(a) It is argued the case falls within the well settled doctrine that, even absent fraud or injury, an **Trust** agent (without his principal's consent) **Relation.** may not sell to himself directly or under cover, that a trustee may not sell to himself without the consent of his *cestui que trust* (and sometimes not with it), that a mortgagee or bailee with power of sale may not buy at his own sale. That doctrine is grounded on the wisdom of the past, is rooted in present sound public policy and may not be departed from. Its philosophy is nowhere more happily stated than by Chancellor KENT in the leading case of Davoue v. Fanning, 2 Johns. Ch. l. c. 259 et seq., thus:

"However innocent the purchase may be in the given case, it is poisonous in its consequences. The *cestui que trust* is not bound to prove, nor is the court bound to judge, that the trustee has made a bargain advantageous to himself. The fact may be so, and yet the party not have it in his power, distinctly and clearly, to show it. There may be fraud, as Lord Hardwicke observed, and the party not able to prove it. It is to guard against this uncertainty and hazard of abuse, and to remove the trustee from temptation, that the rule does and will permit the *cestui que trust* to come, at his option, and without showing actual injury, and insist upon having the experiment of another sale. This is a remedy which goes deep, and touches the very root of the evil. It is one which appears to me, from the cases which have been already cited, and from those which are to follow, to be most conclusively established."

Further on (p. 269) borrowing with approval from a case in the English House of Lords, the chancellor continues:

". . . that the rule was founded in reason and nature, and prevailed wherever any well-regulated administration of justice was known; that the disability rested on the principle which dictated that a person cannot be both judge and party, and serve two masters; that he who is intrusted with the interest of others, cannot be allowed to make the business an object to himself, because, from the frailty of nature, one who has power will be too readily seized with the inclination to serve his own interest at the expense of those for whom he is intrusted; that the danger of temptation does, out of the mere necessity of the case, work a disqualification; nothing less than incapacity being able to shut the door against temptation, where the danger is imminent, and the security against discovery great; that the wise policy of the law had, therefore, put the sting of disability into the temptation, as

a defensive weapon against the strength of the danger
which lies in-the situation; that the parts which the
buyer and seller have to act, stand in direct opposition
to each other in point of interest; and this conflict
of interest is the rock, for shunning which the disabil-
ity has obtained its force, by making that person, who
has the one part intrusted to him, capable of acting
on the other side.''

The Davoue-Fanning case has been followed by
this court (Thornton v. Irwin, 43 Mo. l. c. 163), and its
doctrine finds application when the facts held in judg-
ment warrant. [Bent v. Priest, 86 Mo. 475; Meek v.
Hurst, 223 Mo. l. c. 698 et seq.; Montgomery v. Hund-
ley, 205 Mo. l. c. 148 et seq.]

But I think the argument inapplicable to the facts
of our record. The rule is: The law of a case arises
on the facts of the case. *Ex facto jus oritur.* For not
only are the pleadings cast on the lines of fraud upon
and injury to plaintiff, but the facts do not bring the
case within the range of the strict unmodified general
principle announced, as will presently appear. (Para-
graph *e,* infra.

(b.) Appellant's counsel, to eke out and bolster
up the evidence and sustain his appeal on the theory
of fraud, invokes the doctrine of Hopkins to
use of Williams v. Sievert, 58 Mo. 201, to-wit,
that in pursuit of fraud direct evidence is not
usually possible, hence is not necessary. That very
slight circumstances, apparently trivial and unimport-
ant standing each by itself, though gathered by a mi-
nute and wide search, when put together in natural
sequence and relation may afford irrefragable proof of
a fraudulent intent vitiating a transaction. That is a
doctrine of this court finding much countenance and
usually running hand in hand with a related proposi-
tion, viz., that, however hard to prove, fraud must still
be proved and may not rest on a bank of fog of mere

**Fraud:
Proof.**

suspicion or conjecture. That the presumption is against fraud. [Troll v. Spencer, 238 Mo. l. c. 101-2.]

The case at bar is barren of fraud, and free from all circumstances, indicia or earmarks of it. The same may be said of arbitrariness and oppression which are thinly separated from fraud, if at all. So far as can be seen on the record here, nothing was hid in a corner, everything was open and above-board, the sale followed an apparent call of necessity, or good policy, and the actual consideration was in excess of real value. The trial chancellor so found and we agree with him.

Indeed, we own to being a little inclined to take judicial notice that, barring a mild and (it may be) innocuous form of exaggeration in narrating personal exploits (noticed by close observers and slyly commented on now and then in private discourse), neither huntsmen nor fishermen are addicted to the venal vice of fraud for gain in matters pertaining to their associated dealings. It was Jacob, mark you, and Rebekah, not Esau, the hunter, who covinously contrived a notable property fraud (*q. v.*). And when Simon Peter (worried by trouble and despair) saith, "I go a fishing," and the others said, "We also go with thee," did they not touch a chord and set it vibrating to this very day in many a wholesome bosom? Did not the immortal Izaak Walton say—but, under a spell of gentle memories, we may be straying just a little afield— *revenons a nos moutons.*

The appeal cannot prosper on the theory of fraud and consequent injury.

(c) It is uniformly held that directors of corporations stand in the relation of trustees to the corporate property. Hence when the issue on trial **Fraud by Trustee.** on complaint of a shareholder is whether a transaction should be avoided or profits accounted for in dealings between corporations having interlocked boards of directors, or in dealings with

such directors anent corporate property, such dealings will be judicially eyed with jealousy and sternness to search out and correct lurking mischief. Hill v. Gould, 129 Mo. 106; Keokuk, etc., Packet Co. v. Davidson, 95 Mo. 467; Hannerty v. Standard Theatre Company, 109 Mo. 297; Feld v. Roanoke Investment Co., 123 Mo. 603, are samples of cases marshaled by plaintiff's industrious counsel and illustrating or applying that doctrine. It is argued that the decree in the instant case is impugned by it and must be reversed. But applying the rule of caution and jealousy, this appeal does not prosper on such theory on the facts we are dealing with, under the ruling made in paragraph *b*.

(d) There is a general doctrine of the law, guardedly put as subject to modification, that a corporation

Corporation: Sale of All Properties.

that is a going concern, solvent and not pressed by debts it has no ready means to pay, laboring under no vital distress in its corporate life, may not during its charter life, without the *unanimous* consent of its stockholders, dispose of all its corporate property from which it derives its emoluments and which forms the basis of its business operations and thereby incapacitate itself from going on. [2 Cook's Corporations (6 Ed.), sec. 670; Feld v. Roanoke Investment Co., 123 Mo. l. c. 613.] Appellant invokes that doctrine to avoid the deed of Fish Club to Shooting Club, in the absence of fraud.

But this is not a case to apply a hard-and-fast general rule of that sort, because:

(1) In the first place, plaintiff did not plant himself in the stockholders' meeting on the platform of no

Objection Only to Purchaser.

sale at all. *Contra,* he recognized the wisdom of a sale, but wanted it made to Realty Company and not to Shooting Club. We find no fault with his choice of a vendee, but when he now veers about and seeks to rip up the executed transaction on the theory that, in exist-

ing conditions, no sale should have been made at all, does not such change of front smack of disingenuousness and does it appeal strongly to equity?

(2) In the next place, the corporate status of Fish Club, crippled as it was by the loss of its preserves, and facing a diseased and languishing corporate life in consequence, did not fall within the reason of the rule applicable to a *going concern.*

Going Concern.

In aid of the ruling just made, it is not amiss to point to the allegations and prayer of plaintiff's bill relating to a receivership. Those indicate that, in the mind of plaintiff himself, a crisis had arisen in the corporate life of Fish Club, which made it impracticable to carry on its affairs as designated at its birth, and that events had ridden so fast and far as to call for a receivership for, and winding up of, the corporation. That view of it does not run on all-fours with the theory of "a going concern."

(3) Again: In such a case as this rescission does not go as of course. It goes on equitable principles, if at all, and equity must be done, if possible, as the price of the decree. This record does not disclose how the *status quo ante bellum* may be restored. Certainly Fish Club cannot in this suit get back its preserves without which its club facilities would amount to little. (I say "*little*" not unmindful of their chance to meet and *reminisce,* using their rods, as did the broken soldier his crutch in the deserted village, to show how fish were won.) Nor is it apparent that it is able to pay back the price received, which it may or may not now have in its treasury. Nor does plaintiff's bill run on the theory of doing equity as the price of a decree in his favor. Nor is it sought to avoid the lease from Realty Company (which is not a party defendant) to Shooting Club (which is).

Status Quo.

(4) Finally, the general rule in hand has received an exposition by this court, that, if applied here as it must be, goes a long ways towards affirming the decree. Speaking thereto in Tanner v. Lindell Railway Co., 180 Mo. l. c. 17-18, this court said:

"That is a principle of law founded in justice and is applied to protect the weak against the strong—

Reasonable Grounds.

when the weak is right and the strong is wrong—it is applied to prevent or relieve against an unjust abuse of the power of the majority. It is not an unqualified rule of law. None of the authorities cited say that a sale of all the property of a corporation pursuant to a resolution of a majority of its members is void. They all recognize that the majority in interest have the right to rule within reasonable bounds and that whilst they have no right, arbitrarily or oppressively, to close out a corporation for their own advantage yet they are not compelled to continue an unprofitable business or to pay the minority more than their stock is worth for the privilege of closing it up. The principle invoked by the plaintiffs is wise and just, but, since it is liable to abuse, its wisdom and justice are seen only in its application to the facts of the given case. It is, as before said, designed for the protection of the minority, but like some other equitable principles it is to be used as a shield, not as a sword. When, therefore, the principle is invoked in a court of equity, the case turns on a question of remedy, the court applies the law *ex aequo et bono,* with due regard to the rights of the plaintiff and also with due regard to the rights of the defendants and others whose interests may have become involved. Because all the stockholders have not consented to the sale it does not follow that the sale will be set aside regardless of the consequences. Sometimes when the act is stained with bad faith and only those who are guilty of the wrong are to be affected, the court will set aside the sale and restore the conditions as they

were before. [Abbot v. American Hard Rubber Co., 33 Barb. 578.] And sometimes, when the plaintiff is prompt, the court will enjoin the sale. [Zabriskie v. Railroad, 18 N. J. Eq. 178.]''

The Tanner case has been followed. It was on its authority that a late case, Johnson v. United Railways, 227 Mo. 423, was ruled.

(e) In the case at bar there was no fraud, as already held. Neither are creditors complaining. Neither did the directors convey the club house and grounds without authority from the stockholders; nor did they sell it to themselves and thereby subject themselves to an action on behalf of the corporation at the instance of a non-consenting stockholder, for secret profits. The case is one where the selling corporation, having practically the same directors and shareholders as the buying corporation, conveyed to the latter. As pointed out in paragraph *a* appellant insists this unity of interest and personnel makes it a case of a person with authority to sell, and charged with a fiduciary relation, selling to himself, hence the transaction is void as to a non-consenting stockholder, fraud or no fraud.

*Corporation: Sale to Self.*

It must be admitted the case is close, at first blush and on the surface, to that of such person selling to himself. But up to this time in jurisprudence some controlling significance has been allowed to the fiction that one corporation is a separate entity from every other, a separate juristic person from every other. Hence, in a juristic sense, when Fish Cub by authority of its stockholders sold to Shooting Club, it was not a person selling to himself within the rule discussed in paragraph *a.*

Conceding that the situation bespeaks a close and scrutinizing eye by a court to spy out covin and covert fraud, yet in this jurisdiction, absent fraud, it has not been the rule to avoid a fair transaction between two corporations solely on the ground of unity of person-

nel in directors, or unity of voting power in stockholders, or because of interlocked directorates. Defendants' learned counsel have collated a line of cases whose doctrines run agreeably to the foregoing pronouncement. They will appear in the headnotes of our reporter and some of them are cited supra. We will not lengthen this opinion by quoting from them or citing them here.

The auxiliary relief of a receivership falls with the principal relief, to-wit, rescission, and hence needs no attention if the latter be denied.

On the whole case, in view of the premises, the decree is affirmed. It is so ordered. All concur.