Exchange Bank of Novinger v. Ben E. Turner and Aetna Casualty & Surety Company, Appellants.—14 S. W. (2d) 425.

Division One, February 25, 1929.

1106

*Ben Franklin & Son, Charles E. Murrell, Charles D. Stewart* and *H. H. Bristol* for appellants.

*Higbee & Mills, John M. Campbell* and *M. D. Campbell* for respondent.

1110

ELLISON, C.—This is a suit on a fidelity bond for $10,000 executed by the defendant Turner as principal and the defendant Aetna Casualty & Surety Company as surety. The bond was to indemnify the Union State Bank of Novinger in Adair County against official misconduct of Turner, its president. The bank failed, and while in the hands of the State Banking Department the Exchange Bank of Novinger was organized and took over its assets and liabilities. It is this latter bank which sues as plaintiff, claiming the benefit of the bond by succession or assignment under the foregoing arrangement.

Sixteen transactions breaching the bond are separately alleged (not in separate counts, however) and evidence was introduced on fourteen of them. A jury was waived and the cause tried to the court—in Putnam County where the case was sent on change of venue. Plaintiff got judgment for the full amount, with interest, and for $1000 damages, and $2000 attorney fee for vexatious delay. Both defendants answered, defended and have appealed jointly. There are fifteen assignments of error attacking the proceedings from various angles—the amendment of the petition, the insufficiency of the petition and evidence, the refusal of declarations of law, the admission and exclusion of evidence and the form and size of the judgment. In addition the respondent has filed a motion in this court to dismiss the appeal, because of certain alleged shortcomings in ap-

pellants' abstract and brief; and appellants object to respondent's additional abstract.

Three banks are mentioned in the evidence. All were state banks organized under the law of Missouri. The first was the *Union* Bank of Novinger, which failed and went into the hands of the State Banking Department in September, 1920. The appellant Turner at that time was a state bank examiner and was placed in charge. In October certain stockholders of this Union Bank and other persons, among whom was the appellant Turner, organized a new banking corporation called the *Union State* Bank, to take over the business and assets of the Union Bank.

The appellant Turner was elected president of the Union State Bank and was active in its business. The surety bond sued on was dated December 23, 1920, but the term thereof was expressed to begin on November 25, 1920, and to run until cancelled or terminated as therein stipulated. The bank continued in business for just about a year, until October 15, 1921, when it became insolvent, and was voluntarily placed in the hands of the State Finance Department. A deputy commissioner named Frees was put in charge. He remained for about three months, until January 14, 1922, when the respondent *Exchange* Bank of Novinger was organized to take over the assets and assume the liabilities of the expiring Union State Bank. Forty-four thousand dollars of fresh money were put into the enterprise, making sufficient assets to meet all outstanding liabilities, according to the evidence.

The facts attending the transfer of assets from the Union State Bank to the Exchange Bank are important. After the closing of the former in October, the appellant Turner went to California the latter part of December and was gone until the following February. During this interval (and even before Turner left, for that matter) there was talk of organizing a new bank. Mr. Hughes, the State Bank Commissioner, went to Novinger and advised a reorganization, and later, it seems, twelve of the fifteen stockholders met at the bank and approved the plan. A public meeting was held at the opera house, which was largely attended, and the same sentiment was expressed there. Several meetings were held at lawyers' offices in Kirksville, and finally, as a result of it, all the directors of the Union State Bank, except Turner, had a meeting on January 11, 1922, and unanimously voted to sell and transfer all assets and liabilities to the Exchange Bank in accordance with a contract referred to and set out in the minutes of the meeting, but not preserved in the record here. However, the purport of it is stated several times. It was that the Exchange Bank assumed all liabilities of the Union State Bank, and took over all its assets, including choses in action. The record shows that the board of directors of the Exchange Bank also authorized the contract, and that both banks and the individual directors thereof (except Turner) signed it.

For a better understanding of what is to follow, we must here anticipate the legal discussion by saying the appellants made strenuous objection to all this evidence, contending, as they. do here, that the whole transaction was void: (1) because the board of directors had no authority to transfer all the property of the corporation without the consent of the stockholders, and that such consent was not obtained; (2) because the transaction was at variance with Article I, Chapter 108, Revised Statutes 1919, governing the liquidation of banks by the State Finance Commissioner, in that: (a) the transaction amounted to a voluntary general assignment in violation of Section 11701; (b) no bond was exacted by the Commissioner from the Exchange Bank as a liquidating agent (if it was that) under Section 11706, Revised Statutes 1919; (c) no circuit court order authorizing the sale was obtained as required by Section 11713; (d) no meeting of stockholders was called by the Commissioner to authorize the sale, under Section 11723; (e) and that the transaction contravened the spirit and purpose of the whole article, which lays down a complete and exclusive scheme for the handling and liquidation of insolvent banks. In other words, appellants contend the Exchange Bank did not legally acquire title to the cause of action sued on, and hence is not the proper party to maintain the suit. Bearing on this question, the evidence does not show that there ever was a formal meeting of all the stockholders of the Union State Bank at which the transfer of assets and liabilities to the Exchange Bank was authorized or ratified, but it does show that all of the stockholders except three were present at one informal meeting; and that two of these three were told of the plan afterward and one of them said he couldn't afford to buy stock in the new bank, but then added, ''I wish I could be with you.'' Both of these stockholders had accounts in the Union State Bank which were carried over into the Exchange Bank without objection. The remaining one of these three stockholders was the appellant Turner, and as to him it was brought out that when he was informed of the proposed reorganization before he went to California in December, he replied that ''he did not propose to have anything to do with it and that they could go ahead and do what they wanted with it as far as he was concerned.'' After his return from California, Turner said, according to some of the testimony, that he was glad they had reorganized.

Regarding the attitude of the State Finance Department, the facts developed were that the Commissioner, Mr. Hughes, went to Novinger and urged a reorganization which would take care of depositors and creditors. When the contract between the two banks was approved at a directors' meeting of each on January 11 the deputy commissioner, Mr. Frees, was present. He sent a copy of it to the State Finance Department and after a day or two had elapsed he and Mr. Winn, one of the incorporators of the Exchange Bank, called up Mr. Hughes, the Commissioner, at Jefferson City, and asked him if it

would be all right to go ahead. The Commissioner gave his consent, and that night Mr. Winn and Mr. Frees began checking off the assets. They finished about midnight, and Mr. Frees took a receipt from Mr. Winn therefor. This was on Saturday. The following Monday morning, January 16, the new Exchange Bank opened its doors.

There was some evidence, too, that the appellant Surety Company acquiesced in the assumption by the Exchange Bank of the assets and liabilities of the Union State Bank, its assured. On October 21, 1921, about a week after the Union State Bank closed, the bank, by its attorneys, wrote the appellant surety company a letter advising it of that fact and that there was an apparent shortage in assets, covered by the bond. The appellant company answered by letters both from Hartford and St. Louis, in the latter letter saying ''our Mr. Bristol'' would be in Kirksville on November 7th. Expert accountants were then engaged with Mr. Frees, the deputy commissioner, on an audit of the bank books. When Mr. Bristol came he made only a superficial investigation, saying he would await the completion of the audit.

On January 3rd the attorneys for the bank advised the company by letter that the audit had been completed, and that it showed a shortage in excess of the appellant Turner's bond. Mr. Bristol thereupon returned. This was after the Exchange Bank had opened. He came to the bank and while there admitted liability on two or three items of breach, according to the testimony for respondents. The corporate minute-book was exhibited to him, and in it was the contract of assignment heretofore mentioned and the record of its adoption. He told Mr. Winn of the Exchange Bank to make out a claim, and said he would get a copy of the audit report from the accountants in St. Louis.

Following that on February 27th the attorneys for the bank wrote the company and asked to be advised as to its attitude; and on March 29th they sent a verified and itemized statement of the shortages or breaches claimed under the Turner bond and demanded payment to the *Exchange Bank*. On April 7th they wrote that suit would be filed by April 13th unless settlement was made before that. The company answered that Mr. Bristol would call some time the next week, and that the papers had been sent to the home office for instructions. Apparently he did come, but what was done is not clearly shown. The next thing on the record is a letter from the bank's attorneys dated July 18th positively asking for a statement as to the position of the company. The company answered on July 26th disclaiming liability. This suit was filed on September 15th— all the above dates are in 1922. After the filing and disposition of certain demurrers, a motion to make the petition more definite and certain, a motion for a change of venue, and a motion for costs, the appellants filed their answer on June 22, 1925, and the case went to trial.

It will be unnecessary to state in detail the facts on which are based the various charges of breach of the bond. One charge is that Turner used $1060 of the bank's funds to buy back certain shares of its capital stock from a stockholder after he knew the stock was worthless. Some eight or ten of them are that he permitted insolvent bank customers to overdraw their accounts. Four or five of them allege he wrongfully made bad loans to insolvent persons and corporations. And one is that he wrongfully used the funds of the bank to take up certain notes which were really the personal obligation of the president of the old Union Bank. Turner asserted his directors knew of these various transactions at the time they were had, or were advised of them at directors' meetings shortly afterward. The directors testified he represented to them and to the public at the time the Union Bank was reorganized into the Union State Bank, that the Union Bank was solvent and never should have been closed; that he told them the Union State Bank was doing well during nearly all the time he was president; and that they did not know of the various transgressions complained of until October, 1921, when the bank suspended.

After the evidence was closed late in June, 1925, the court took the cause under advisement until July 15th, during the same term of court. On the latter date the respondent amended its petition by adding to the allegation quoted below the part in italics: that the Exchange Bank "for a valuable consideration took over and became the owner of all the assets and property of said Union State Bank, *assumed its liabilities and has paid the same.*"

I. The appellants contend the petition was fatally defective and stated no cause of action at all, because it failed to allege the respondent bank took over the assets of the Union State Bank *for the purpose of liquidating the latter.* Appellants say it is held in Citizens Trust Co. et al. v. Tindle et al., 272 Mo. 681, 689, 199 S. W. 1025, 1026, that when a suit is based on facts such as are present here, the petition must contain an allegation of that character. A reading of the case cited does not verify appellants' statement. There was such an allegation in the petition there considered and the opinion does say that when a bank is insolvent and in the hands of the State Finance Department, a transfer of the assets to another bank for liquidation under the supervision of the Finance Department is not violative of Section 11701, Revised Statutes 1919, which forbids a failing bank to make a general assignment for the benefit of creditors. But we find nothing in the opinion holding an assignee bank is required in such circumstances to plead the details of its title in the petition in any suit it may bring.

The petition in this case did not plead the insolvency of the Union State Bank, or that it was in the hands of the State Finance Depart-

ment at the time of the transfer to the respondent bank. The allegations were confined to a straight recital of the ultimate fact that the respondent bank for a valuable consideration took over the assets of the Union State Bank and became the owner thereof, and assumed its liabilities and had paid them. The fact that the Union State Bank was insolvent and in the hands of the State Finance Department came out in the evidence, and at the same time the further fact came out that the transfer was made for the purpose of liquidation. We think the petition was sufficient to support the proof; and that the Tindle case warrants that conclusion, instead of being an authority for appellants—for it says (272 Mo. 1. c. 695, 199 S. W. 1. c. 1028) that if the defendants desired to attack the transfer of assets they should have done so as a matter of defense by answer. The Kansas City Court of Appeals appears to have taken the same view in a somewhat similar case, Farmers State Bank v. Miller, 300 S. W. 834, 838. There the suit was by an assignee bank on a promissory note. The petition appears to have been conventional and the facts about the transfer of the note to the plaintiff by a failing bank for the purpose of liquidation, with the consent of the Finance Department, were developed in the evidence. The case of Smith & Kinzer v. Dean, 19 Mo. 63, cited by appellants, is not to the contrary. The petition there alleged merely the legal conclusion that the plaintiff was the legal holder of the note sued on.

II. The appellants next complain of the amendment in the petition in the manner heretofore stated, after the evidence was in and the witnesses had been discharged. Cases are cited  saying "a petition which states no cause of action at all cannot be amended after judgment so as to state one;" and other decisions, holding that amendments which change the cause of action should not be allowed. Reference is made also to authorities along the line that it is improper to permit an amendment after the hearing of evidence is over, when a new issue is thereby introduced of which the other party has not been advised and which he is not prepared to meet. All these rules are correct, but they have no application to this case. The amendment permitted by the court in this instance was trivial; it did not change the cause of action; and the petition was not fatally defective to begin with. The evidence had already gone in without objection (on that score) that the Exchange Bank assumed the liabilities of the Union State Bank and was paying them, and when the amendment was made to conform to the proof the appellants did not claim surprise or ask to reopen the case. This point is ruled against appellants.

III. The next assignment is that the judgment is fatally defective in that it was a general judgment for a lump' sum without a separate finding as to each of the fourteen breaches of the bond alleged in the

1118

petition and relied upon at the trial. Some eight cases are cited. The leading one is Flowers v. Smith, 214 Mo. 98, 128 et seq., 112 S. W. 499, 507, in which it is held that "where the several causes of action are united in one count, and the case is tried on all, and a simple verdict and assessment of damages in favor of the plaintiff, if one or more of the causes of action assigned be bad, so as not to support the verdict, the verdict must be bad as to all." Even if this be good law as applied to this case, it is premised on the assumption that one or more of the several causes of action assigned is bad; and appellants have not shown that to be the fact, nor is it. But aside from all that, the judgment in this case is not a general judgment without separate findings. In appellants' abstract of the record they show in their *bill of exceptions* an entry of the judgment, certified by the circuit clerk as having been taken from the *minute* book of the court, as follows:

"Cause having been submitted to the court sitting as a jury, finding and judgment for plaintiff for $10,000 with six per cent interest thereon from August 1, 1922, and $1000, being ten per cent damages, and $2,000 attorney fee for vexatious refusal."

But the full judgment brought up to this court by *appellants* when they lodged this appeal here under Section 1479, Revised Statutes 1919, expressly finds for the plaintiff on all the fourteen breaches complained of, and that they all represented a loss of over $19,000; and it furthermore renders judgment for plaintiff for the whole amount of the separate sums mentioned in the minute entry, totaling $14,910. We have a right to look to the certified copy of the judgment on file here. It is the basis of the appeal. [State ex rel. v. Smith, 172 Mo. 618, 73 S. W. 134; Mahaffey v. Lebanon Cemetery Assn., 253 Mo. 135, 141, 161 S. W. 701.] And since it is so patent from the face of the proceedings that this latter shows the *judgment* rendered by the court, we shall rule the point on that basis against the appellants.

IV. The next assignment is that the court erred in refusing appellants' declarations of law numbered 1 to 7. On turning to the abstract we find the following recital: "At the conclusion of all the evidence in the case the defendants pray the court to declare the law in this case to be as follows." Following that is certain matter in eight paragraphs covering about two pages of the printed abstract. The paragraphs are not numbered. Some of them begin with the words: "The court declares the law to be," and some do not. Without setting them all out, or even their substance, it will be sufficient to say we think some of the propositions propounded were sound and some were not. In this state of the case, what was said in Chouteau v. Missouri-Lincoln Trust Co., 310 Mo. 665, 683, 276 S. W. 49, 54, is applicable:

"It is finally urged that the trial court committed error in refusing instructions offered by the defendant. The record does not afford a sufficient basis for the consideration of this assignment. Under the heading, 'Defendant's Refused Instructions,' follow nearly eight pages of printed matter in successive paragraphs, but otherwise without subdivision or separation as to subject-matter. The paragraphs are not numbered. We are unable to tell from the record whether the whole was offered as one instruction, or whether there were separate offers of different parts of it. There are certain paragraphs which, if they had been offered as single instructions, should have been given, but we cannot assume they were so offered; nor can we convict the trial court of error in not separating the good from the bad."

We do not ignore appellants' insistence that each of the eight paragraphs was a separate declaration just as much as if they had been separately numbered. Neither have we overlooked the recital in the abstract that the court refused to give said declarations of law *and each of them.* But we cannot uphold these contentions. The assignment of error in appellants' brief specifies the refusal of instructions *one to seven.* In the argument appellants complain of the rejection of *eight* instructions. They are not sufficiently identified to warrant speculation as to just what the trial court was asked to do. On the face of things it seems some of the declarations, for instance, the one on the burden of proof, would have been given if they had been separately submitted. The abstract is seriously at fault. In these circumstances it is not unduly harsh and we but follow many precedents in disallowing appellants' contention.

V. One of the declarations of law referred to in the preceeding paragraphs was an instruction in the nature of a demurrer to the evidence at the close of the case. As we have ruled these declarations are not properly before us, we would be justified in disregarding it; but since the questions raised go to the vitals of the case and so much space is given to them in the briefs, we feel we ought not to ignore them. The gist of appellants' theory is that the respondent Exchange Bank had no title to the claim sued on because the assignment of the assets of the Union State Bank was void in that: (1) all its stockholders did not formally authorize the transfer, action by the board of directors alone being insufficient; (2) the transaction was in violation of the statutes governing the liquidation of insolvent banks by the State Finance Department.

As to the first point, it is true the board of directors of a going corporation has no right to convey away all its assets without the unanimous consent of its stockholders. [Feld v. Roanoke Investment Co., 123 Mo. 603, 613, 27 S. W. 635; Hidden v. Edwards, 313 Mo. 642, 661, 285 S. W. 462.] But such is not the rule when the corporation

is insolvent and the stockholders have no equity to protect. [14 C. J. 866, sec. 1323; 7 R. C. L. 312, sec. 287; 5 A. L. R. 932, note; 35 L. R. A. (N. S.) 400, note; Tanner v. Lindell Ry. Co., 180 Mo. 1, 16, 79 S. W. 155, 158, 103 A. S. R. 534; Cummings v. Parker, 250 Mo. 427, 441, 157 S. W. 629, 633.]

Indeed, even when the corporation is solvent it seems such a conveyance is not *ipso facto* void, and that dissenting minority stockholders will be cast on their remedy at law unless the facts warrant a *rescission*. [Tanner v. Lindell Ry. Co., supra; Newell v. Wagner Electric Mfg. Co., 318 Mo. 1031 (Banc), 4 S. W. (2d) 1072, 1082 et seq.] But it is unnecessary to go into the refinements of that doctrine or to consider the effect of Laws 1927, page 386, since that act was passed long after the happening of the events here involved. We need only hold, as we do, that since the Union State Bank was admittedly insolvent, and since it affirmatively appears $44,000 of fresh money was put into the enterprise and all depositors and creditors were made whole, and since the appellants Turner and his surety now challenge the transfer for the first time when sued on his bond, without claiming any improvidence or fraud in the transaction—for these reasons, we say, the assignment is not open to collateral attack in this case on the ground that the directors of the Union State Bank had no power to make it.

In this connection the following statutes should be referred to: Sections 9756, 9757 and 9759, Revised Statutes 1919, as repealed and reenacted by Laws 1921, page 264, and Section 9758, Revised Statutes 1919. In some circumstances the sale of all the assets of an insolvent corporation is said to work a *de facto* dissolution thereof (Hidden v. Edwards, supra, 313 Mo. l. c. 662, 285 S. W. l. c. 468); and the statutes just mentioned provide how a corporation shall be dissolved (Luehrmann v. Lincoln Trust & Title Co. (Mo., Div. 1), 192 S. W. 1026, 1032). But even if it can be said with certainty this record shows the transfer of the assets of the Union State Bank brought about an immediate, complete and permanent cessation of all its corporate functions (which seems doubtful) yet we must hold, for the reasons given above, that the sale was not absolutely void, and that the point cannot be raised collaterally as a mere defense.

Appellants' second point is the one they stress. They say the whole transaction was void as being contrary to the letter and spirit of our banking laws, Article 1, Chapter 108, Revised Statutes 1919, and especially Section 11701 thereof, which forbids a failing or insolvent bank from making a voluntary general assignment of its business and affairs. The cases cited in support of this contention are: Koch v. Missouri-Lincoln Trust Co. (Mo., Div. 1), 181 S. W. 44, 48; Citizens Trust Co. v. Tindle, supra, 272 Mo. 681, 199 S. W. 1025; and Haight v. Stuart, decided by the Springfield Court of Appeals, 220 Mo. App. 78, 83, 278 S. W. 1091, 1093. The Koch case declares the state banking act

provides a complete and exclusive scheme for winding up insolvent banks; and on authority of that case and the Tindle case, the Haight case holds a bank may liquidate its own affairs if *not insolvent*, though it be in failing condition. From these two authorities appellants draw the conclusion that if a bank *is* insolvent any deviation from the requirements of the banking law in the sale of its assets will be fatal.

But it is to be noticed the holding in the Haight case is bottomed partly on the Tindle case, which was decided in Court En Banc; and we do not think the latter decision bears the interpretation put upon it by the Springfield Court of Appeals. The Tindle case was appealed from an order of the circuit court sustaining a demurrer to the petition. The strictly record facts are rather meager, but the opinion shows a bank in Pemiscot County through the peculations of its cashier and his accomplices lost "several hundred thousand dollars" and "ceased to be an active concern" in June, 1913, at which time it assigned its assets to a trust company for liquidation with the acquiescence of its stockholders and depositors. The case does not say in so many words that the bank was insolvent, or that the State Banking Department had taken charge, but of that, more later. Among the assets passed by the assignment was a fidelity bond which the defaulting cashier had executed in favor of the bank. The trust company brought suit thereon as assignee and trustee, and the defendants interposed the demurrer mentioned above, one of the grounds thereof being that the trust company had no title to the cause of action sued on because the assignment was void and in violation of Section 1084, Revised Statutes 1909, which was substantially the same as the present Section 11701, Revised Statutes 1919.

The opinion sets out the statute, and then says in substance (272 Mo. 1. c. 694, 199 S. W. 1. c. 1028) that the purpose thereof was to prohibit insolvent banks from liquidating under the general law and to confine them to the jurisdiction of the State Banking Department in the circumstances contemplated by and indicated in the section; but that the primary object of the provision was to secure an honest and economical administration of the assets for the protection of those concerned; and so, when all the interested parties desired to take the matter into their own hands, the statute did not deprive them of that right, especially since economies would be effected. The assignment was held valid, and the court said no more effective instrumentality for the accomplishment of the liquidation could be employed than a trust company working under the supervision of the State Banking Department.

As indicated in the foregoing summary the ruling of the case is expressly applied to *insolvent* banks, and to our minds the opinion as a whole shows the bank involved was in fact insolvent and in the hands of the Banking Department. But to clear up that point we have examined the briefs in the cause, which are now lodged in the files of

this court; and from them we find the Pemiscot County Bank had lost over $380,000; that it had failed, was insolvent, its doors closed, and the State Banking Department in charge; that the Banking Department had counseled and advised the organization of a new bank to take over its assets and liquidate them; and that the plan was consummated by the organization of the trust company. All these facts are recited in the briefs and make the case strikingly like the one at bar.

But there is one further question. The Tindle case was decided on the statutes as they stood in the revision of 1909; and while Section 1084 of that revision is practically the same as Section 11701, Revised Statutes 1919, we have in the present revision another section, Section 11702, which says:

"When the commissioner shall have duly taken possession of such corporation or private banker, under any provision of this chapter, he may hold such possession until its affairs are finally liquidated by him, unless:

"1. He shall have permitted such corporation or banker to resume business pursuant to the provisions of Section 11705.

"2. The commissioner shall have been directed by order of the court to surrender such possession pursuant to the provisions of Section 11704.

"3. The stockholders of such corporation, at a meeting called by the commissioner pursuant to the provisions of Section 11723, shall have duly determined to appoint and shall have appointed an agent or agents to continue the liquidation of such corporation, and such agent or agents shall have qualified to take possession of its remaining assets as provided in Section 11723.

"4. The depositors and other creditors of such corporation or banker and the expenses of such liquidation shall have been paid in full."

Is the decision in the Tindle case rendered inapplicable to our present law by this added section? Is there anything in it which forbade the Finance Commissioner from relinquishing control of the assets of the Union State Bank to permit their assignment to the Exchange Bank on the terms and under the facts shown in this record? We think not. The statute says the Finance Commissioner *may* remain in possession of a defunct bank until final liquidation thereof unless one or more of the four conditions enumerated be satisfied— not that he *shall* do so. Besides, the facts come very nearly bringing the case within the fourth condition of the section, if they do not. The undisputed evidence is that all liabilities of the Union State Bank, including depositors' accounts, were transferred to and assumed by the Exchange Bank, and that enough fresh money was put in the latter to pay them. If this was done with the consent of all the creditors it amounted to a payment. Perhaps the evidence is not

full enough to warrant us in holding there was a payment in this case, for, as to some of the depositors, the only showing is that they remained silent and did not object (Johnson v. United Rys. Co., 227 Mo. 423, 453, 127 S. W. 63, 72); but certain it is that under the facts and the law the Finance Commissioner was justified in exercising a sound discretion in the matter. And so we think the Tindle case is controlling.

One other point is made with respect to the Tindle case. Appellants distinguish it by saying the assignment there upheld was a sale in trust for the purpose of *liquidation*, whereas the transfer in this case was an outright sale for the purpose of vesting full title and ownership in the Exchange Bank. That is true, but it was for the purpose of liquidation so far as the Union State Bank was concerned, and that is all that is important.

Some twelve other sections of Article I, Chapter 108, Revised Statutes 1919, are referred to in appellants' brief, but there are only two that call for comment. Section 11713 provides that the Finance Commissioner may sell all or any part of the property of a bank in his charge on such terms as the circuit court may direct; and the evidence does not show the assignment in this case was submitted to and approved by the court. Under our holding above this section has no application, because the Finance Commissioner did not make the sale. He simply surrendered control of the assets, and the Union State Bank executed the assignment.

The other section, Section 11723, provides that when the Finance Commissioner shall have liquidated a bank to the point where all creditors and the expenses of liquidation have been paid and proper provision has been made for claims in litigation, he must call a meeting of the stockholders to determine whether he shall proceed further, collect and liquidate the remaining assets, and wind up the affairs of the corporation. No such meeting was called in this case, but obviously the facts do not bring it within this section.

VI. The next assignment is that the court erred in admitting a transcript of evidence given by the appellant Turner on a former occasion concerning certain of his conversations with and admissions to directors of the respondent Exchange Bank, after the Union State Bank had closed. The conversations and admissions referred to are not specified. We have looked through the argument in appellants' brief and find no reference to the assignment or elaboration of it. Under the assignment in Points and Authorities are cited cases holding that a surety is not bound by the admission of his principal made after being discharged from his agency.

Reference to the abstract shows two transcripts of Turner's testimony given on former occasions in other cases. Both contain admissions against interest which were certainly competent against Turner, himself; and we do not find any objection thereto made on the special ground urged now. The objections offered were that the transcripts were incompetent altogether and for any purpose, because taken in another case and not properly authenticated; that they were irrelevant and immaterial; and that they had not been submitted to the witness. For these reasons the point is ruled against appellants. Only through indulgence have we gone into the matter as such length. The assignment is really not entitled to consideration because not presented with sufficient clearness. [Vahldick v. Vahldick, 264 Mo. 529, 175 S. W. 199.]

VII. Appellants contend the record fails to show the giving of notice of loss within ten days after the discovery thereof, and the filing of proofs of loss within ninety days, as required by the following clause of the bond:

"The bank, on becoming aware of any act which may be made the basis of any claim hereunder, shall, within ten days after such discovery, deliver written notice thereof to the Surety at its Home Office in the City of Hartford, Connecticut, and shall, within ninety days after the discovery of such loss, file with the Surety particulars and proofs of the correctness of said claim, and such proofs, if required by Surety, shall be verified by affidavit:

The bank closed on October 15, 1921, and the directors testified they first learned of Turner's delinquencies on that date, but the appellants claim the directors had actual or constructive knowledge of them as and when they occurred. There is nothing to this contention of appellants that the directors were *bound* to know what was going on in the bank, because the evident intention of the quoted clause in the bond is to require actual knowledge; but aside from all that, we think the evidence for respondent was sufficient to support a finding that the appellant surety company waived compliance with these provisions, or is estopped to rely on them.

The surety company was notified on October 21st, within six days after the bank closed, that there was an apparent shortage chargeable to the bond. The company's representative, Mr. Bristol, went to Kirksville on November 7th in response to this letter. At that time expert accountants were at work on the bank books. Mr. Bristol said he would complete his investigation after the audit was finished. On January 3rd, the bank's attorneys advised the surety company that the audit had been completed and that it showed a shortage in excess of the coverage of the bond. Mr. Bristol thereupon returned. This was after the Exchange Bank had opened on January 16th, which was more than ninety days subsequent to discovery of the loss, according to the testimony for respondent, and

still longer if the losses were discovered earlier, as appellants assert. On that occasion he admitted liability on two or three items of breach, and said he would get a copy of the audit report from the accountants in St. Louis. At the same time he told the cashier of the respondent bank to make out a claim. On February 27th the bank attorneys wrote the surety company inquiring as to its attitude, and, receiving no answer, on March 29th they sent a verified and itemized statement of the breaches claimed under the bond. Following that there was an exchange of correspondence and Mr. Bristol made another trip to Kirksville. Not until July 26th, nearly four months later, did the company deny liability, then simply saying:

"The proof of loss furnished by you together with such other information as you have submitted is not sufficient to warrant payment by the Aetna Casualty & Surety Company of the amounts demanded by you in behalf of the Union State Bank of Novinger, Missouri."

Thus it will be seen that by a connected series of acts commencing before the expiration of the ninety day period and continued thereafter, the company invited discussion and disclosure of the substantive merits of the claim, and acknowledged some liability, without intimating it would or did stand on the time limit fixed in the bond for making proof of loss, and even the final letter which refused payment was not based on that ground. By implication the time was extended. In these circumstances the defense is not available now. [Lowenstein v. Queen Ins. Co., 227 Mo. 100, 113, 127 S. W. 72, 75; Campbell v. National Fire Ins. Co. (St. L. Ct. App.), 269 S. W. 645, 648.]

VIII. Complaint is made, also, on the ground that the facts did not warrant the assessment for vexatious delay under Section 6337, Revised Statutes 1919. It is true, as appellants say, that insurance companies, acting in good faith, may contest either issues of fact or law without subjecting themselves to the penalties of the statute; and there are some issues of law in this case about which lawyers reasonably might differ. [Aufrichtig v. Columbia Natl. Life Ins. Co., 298 Mo. 1, 15, 249 S. W. 912; State ex rel. v. Fid. & Dep. Co., 317 Mo. 1078, 1095, 298 S. W. 83, 91.] But the mere presence of a real law question in the record will not of itself exculpate the defendant from a charge of wilful obstruction if there is evidence that its attitude was vexatious and recalcitrant. [Non-Royalty Shoe Co. v. Phoenix Assurance Co., 277 Mo. 399, 423, 210 S. W. 37, 43; Fay v. Aetna Life Ins. Co., 268 Mo. 373, 388, 187 S. W. 861, 865; Young v. Penn. Fire Ins. Co., 269 Mo. 1, 21, 187 S. W. 856, 861.]

As appears from the facts heretofore recited, the appellant surety company was advised of the claim under the bond within six days after the bank failed. Its representative was soon on the ground.

Presently, thereafter it was advised of the audit of the bank books. Following that it was served with a formal, itemized proof of loss. Nearly four months of delay ensued thereafter, during which interval some of the letters from the bank's attorneys appear to have been passed unanswered. When liability finally was denied no definite reasons for the refusal were assigned. After suit was brought the premium on the bond was retained for two years and nine months until tendered back in the answer filed, and certainly if it ought to have been refunded at all such delay was unreasonable. [Avery v. Mechanics' Ins. Co. (K. C. Ct. App.), 295 S. W. 509, 513.] Considering all the circumstances we think the question was one of fact for the court sitting as a jury.

IX. There are still other formal assignments, but we do not find them covered in the Points and Authorities or developed to any conclusion in the Argument. There is a review of the testimony with criticisms and comments here and there. It is said the evidence fails to show any pecuniary loss suffered by the Union State Bank as a result of Turner's conduct, but to our minds the record is full of it. In our opinion there was substantial evidence to support the finding and judgment, and we are therefore bound by the conclusions of the court below. [Nickey v. Leader, 235 Mo. 30, 43-4, 138 S. W. 18.]

The judgment is affirmed. *Lindsay* and *Seddon, CC.,* concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur, except *Frank, J.,* not sitting.